ACCEPTED
03-15-00446-CV
7113707
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/25/2015 10:24:30 PM
JEFFREY D. KYLE
CLERK

NO. 03-15-00446-CV

IN THE
COURT OF APPEALS FOR THE
THIRD COURT OF APPEALS DISTRICT
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/25/2015 10:24:30 PM
JEFFREY D. KYLE
Clerk

—————————

BAXTER OIL SERVICE, LTD.
APPELLANT

VERSUS

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
APPELLEE

—————————

APPEAL FROM THE 345TH JUDICIAL DISTRICT COURT, TRAVIS COUNTY, TEXAS
NO. D-1-GN-10-000772

# BRIEF OF APPELLANT

PULMAN, CAPPUCCIO, PULLEN, BENSON & JONES, LLP
Elliott S. Cappuccio
Texas State Bar No. 24008419
Leslie Sara Hyman
Texas State Bar No. 00798274
Etan Z. Tepperman
Texas State Bar No. 24088514
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
(210) 222-9494 (Telephone)
(210) 892-1610 (Facsimile)

*Attorneys for Appellant*

APPELLANT REQUESTS ORAL ARGUMENT

IN THE
COURT OF APPEALS FOR THE
THIRD COURT OF APPEALS DISTRICT
AUSTIN, TEXAS
_____

BAXTER OIL SERVICE, LTD.
APPELLANT

VERSUS

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
APPELLEE
_____

## IDENTITY OF PARTIES AND COUNSEL

| Appellant: | Appellate Counsel for Appellant: |
|---|---|
| Baxter Oil Service, Ltd. | Elliott S. Cappuccio<br>Leslie Sara Hyman<br>Etan Z. Tepperman<br>Pulman, Cappuccio,<br>Pullen, Benson & Jones, LLP<br>2161 NW Military Highway, Suite 400<br>San Antonio, Texas  78213 |

|  | Trial Counsel for Appellant:<br><br>Cynthia J. Bishop<br>C Bishop Law PC<br>P. O. Box 612994<br>Dallas, Texas  75261 |
|---|---|
| Appellee:<br><br>Texas Commission on Environmental Quality | Counsel for Appellee:<br><br>Thomas H. Edwards<br>Craig J. Pritzlaff<br>Office of the Attorney General<br>P. O. Box 12548, Capital Station<br>Austin, Texas  78711 |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ................................................................ i

TABLE OF CONTENTS ............................................................................... iii

INDEX OF AUTHORITIES ............................................................................ iv

STATEMENT OF THE CASE ........................................................................... 1

ORAL ARGUMENT STATEMENT ....................................................................... 2

ISSUES PRESENTED ................................................................................ 2

STATEMENT OF FACTS .............................................................................. 3

SUMMARY OF THE ARGUMENT ........................................................................ 8

ARGUMENT ....................................................................................... 9

I.  Baxter Was Deprived of Due Process ........................................................... 9

    A.  Baxter Is Entitled To Due Process ........................................................ 9

    B.  "Adequate" Notice is an Essential Element of Due Process .................................. 11

    C.  The Notice to Baxter Did Not Provide Baxter Sufficient Information ..... 15

        1.  The TCEQ Did Not Provide Any Notice of the
            Right to Appeal the Order ............................................................ 15

        2.  Constructive Notice of Appellate Rights Is Inadequate
            Given the Circumstances and Conditions of This Case ..................................... 18

        3.  The TCEQ Did Not Provide Adequate Notice of the
            of the Issues or Consequences ......................................................... 22

    D.  Because it Lacked Sufficient Information, the Order
        Violated Due Process and Was Void ........................................................ 24

II. Because the Order is Void, it May be Collaterally Attacked
    at Any Time and the Trial Court Erred in Granting
    the TCEQ's Plea to the Jurisdiction ........................................................ 27

CONCLUSION AND PRAYER ........................................................................... 29

CERTIFICATE OF COMPLIANCE ....................................................................... 31

CERTIFICATE OF SERVICE .......................................................................... 31

## INDEX OF AUTHORITIES

**Cases**                                                      **Page**

*Armstrong v. Manzo,*
380 U.S. 545 (1965) ...............................................................................10

*Barrera-Montenegro v. United States,*
74 F.3d 657 (5th Cir. 1996) ...................................................................14

*Baxter v. Colvin,*
No. 14-CV-01306, 2014 WL 6985149 (N.D. Cal. Dec. 10, 2014) .......13

*Boddie v. Connecticut,*
401 U.S. 371 (1971) .............................................................................9, 10

*Bradford v. Edelstein,*
467 F. Supp. 1361 (S.D. Tex. 1979) ..................................................12, 18

*Buckner Trucking, Inc. v. United States,*
354 F. Supp. 1210 (S.D. Tex.1973) .........................................................22

*Butland v. Bowen,*
673 F. Supp. 638 (D. Mass. 1987) ...........................................................13

*Chocolate Bayou Water Co. & Sand Supply v. Tex. Natural Res.*
*Conserv. Comm'n,*
124 S.W.3d 844 (Tex. App.—Austin 2003, pet. denied) .......................28

*Chow v. Dole,*
677 S.W.2d 220 (Tex. App.—Houston [1st Dist.] 1984, no writ)..........18

*City of Celina v. Dynavest Joint Venture,*
253 S.W.3d 399 (Tex. App.—Austin 2008, no pet.),
*rev'd on other grounds, Rusk State Hospital v. Black,*
392 S.W.3d 88 (Tex. 2012).....................................................................28

*City of Dallas v. VSC, LLC,*
347 S.W.3d 231 (Tex. 2011)........................................................20, 21, 22

*City of Waco v. Roddey,*
613 S.W.2d 360 (Tex. App.—Waco 1981, no writ) ...............................12

**Cases (Continued)** **Page**

*City of West Covina v. Perkins,*
  525 U.S. 234 (1999) ......................................................................19, 20, 21, 22

*Cleveland Bd. of Educ. v. Loudermill,*
  470 U.S. 532 (1985) .................................................................................10

*Consolidation Coal Co. v. Georgia Power Co.,*
  781 F.3d 129 (4th Cir. 2015) ..................................................................26

*Dusenbery v. United States,*
  534 U.S. 161 (2002) .................................................................................20

*FCC v. Pottsville Broadcasting Co.,*
  309 U.S. 134 (1940) .................................................................................13

*Fuentes v. Shevin,*
  407 U.S. 67 (1972) .....................................................................................9

*Gonzalez v. Sullivan,*
  914 F.2d 1197 (9th Cir. 1990) ..........................................................13, 27

*Hess & Clark, Division of Rhodia, Inc. v. Food and Drug Administration,*
  495 F.2d 975 (D.C. Cir. 1974) ...............................................................13

*Houston v. Fore,*
  412 S.W.2d 35 (Tex. 1967) ................................................................11, 29

*In re Guardianship of B.A.G.,*
794 S.W.2d 510 (Tex. App.—Corpus Christi 1990, no writ) ...........27, 28

*In re E.R.,*
  385 S.W.3d 552 (Tex. 2012) ...............................................................28, 29

*In re Ruffalo,*
  390 U.S. 544 (1968) .................................................................................13

*Joint Anti-Facist Comm. v. McGrath,*
  341 U.S. 123 (1951) ...............................................................................9, 11

**Cases (Continued)** **Page**

*Jones v. Flowers*,
   547 U.S. 220 (2006) ...................................................................................20

*L.B.L. Oil Co. v. Int'l Powers Serv., Inc.*,
   777 S.W.2d 390 (Tex. 1989)........................................................................18

*Langdale v. Villamil*,
   813 S.W.2d 187 (Tex. App.—Houston [14th Dist.] 1991, no writ) ......................12

*Lesikar v. Rappeport*,
   33 S.W.3d 282 (Tex. App.—Texarkana 2000, no pet) ..........................................28

*Logan v. Zimmerman Brush Co.*,
   455 U.S 422 (1982) ...........................................................................10, 14

*Lopez v. Lopez,*
   757 S.W.2d 721 (Tex. 1988)........................................................................18

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ..................................................................... *Passim*

*Memphis Light, Gas, & Water Div. v. Craft*,
   436 U.S. 1 (1978) .......................................................................................18

*Misium v. Misium*,
   902 S.W.2d 195 (Tex. App.—Eastland 1995, no writ)...........................................18

*Moss v. Malone*,
   880 S.W.2d 45 (Tex. App.—Tyler 1994, writ denied) ..........................................18

*Mosser v. Plano Three Venture*,
   893 S.W.2d 8 (Tex. App.—Dallas 1994, no writ) ..........................................11, 12

*Mullane v. Central Hanover Bank Trust Co.*,
   339 U.S. 306 (1950) ..................................................................... *Passim*

*Navato v. Sletten*,
   560 F.2d 340 (8th Cir.1977) ..........................................................................13

**Cases (Continued)**                                                                        **Page**

*North Alabama Express, Inc. v. United States*,
   585 F.2d 783 (5th Cir.1978) ...............................................................................13

*N.Y. Life Ins. Co. v. Brown*,
   84 F.3d 137 (5th Cir. 1996) ............................................................................27, 28

*Peralta v. Heights Med. Ctr. Inc.*,
   485 U.S. 80 (1988) ..............................................................................................14

*Roman Catholic Diocese of Dallas v. County of Dallas Tax Collector*,
   228 S.W.3d 475 (Tex. App.—Dallas 2007, no pet.)..............................................28

*Rotello v. State,*
   492 S.W.2d 347 (Tex. Civ. App.—Houston [1st Dist.] 1973,
   writ ref'd n.r.e., per curiam) ...............................................................................18

*Security State Bank & Trust v. Bexar Cty.*,
   397 S.W.3d 715 (Tex. App.—San Antonio 2012, pet. denied) .......................27, 28

*Stubbs v. Stubbs,*
   685 S.W.2d 643 (Tex. 1985)................................................................................18

*Tramco Enter., Inc. v. Indep. Am. Sav. Ass'n,18*
   739 S.W.2d 944 (Tex. App.—Fort Worth 1987, no writ)....................................18

*Valero South Texas Processing Co. v. Starr County Appraisal District*,
   954 S.W.2d 863 (Tex. App.—San Antonio 1997, no writ) .................................11

*Villegas v. Carter,*
   711 S.W.2d 624 (Tex. 1986)................................................................................18

*Vine St. LLC v. Borg Warner Corp.*,
   776 F.3d 312 (5th Cir. 2015) ..........................................................................25, 26

*Walker v. City of Hutchison*,
   352 U.S. 112 (1956) ....................................................................................11, 18, 22

**Cases (Continued)** **Page**

*Williams v. Holley*,
  653 S.W.2d 639 (Tex. App.—Waco 1983, writ ref'd n.r.e.) ................................12

*Wolff v. McDonnell*,
  418 U.S. 539 (1974) .................................................................................13

**Constitutions**

U.S. Const. amend. XIV ...............................................................................2, 9

Tex. Const. art. 1, § 19 ...................................................................................9

**Statutes**

Tex. Health & Safety Code § 361.188 ...............................................................5

Tex. Health & Safety Code § 361.272 ...............................................................5

Tex. Health & Safety Code § 361.321 ...........................................................18, 26

Tex. Health & Safety Code § 361.322 ...........................................................18, 26

**Secondary Sources**

*Webster's New International
Dictionary of the English Language* (2nd ed. 1935) ................................................23

## STATEMENT OF THE CASE

*Nature of the Case*        Appellee, the Texas Commission on Environmental Quality (the "TCEQ"), sued Appellant, Baxter Oil Service, Ltd. ("Baxter"), in order to enforce an administrative order. CR 283–424. Baxter filed a motion for summary judgment, attempting to negate elements of the TCEQ's claim. CR 1458–1581. In addition to responding to Baxter's motion for summary judgment on the merits, the TCEQ filed a plea to the jurisdiction claiming that Baxter impermissibly sought a collateral attack of the TCEQ's administrative order. CR 1582–1703. After further briefing by both parties, CR 1704–1934, and a hearing, RR 1–56, the trial court granted the TCEQ's plea to the jurisdiction. CR 1592.

*Trial Court*        The Honorable Amy Clark Meachum of 345th Judicial District Court, Travis County, Texas.

*Trial Court's Disposition*        The trial court granted the TCEQ's plea to the jurisdiction and dismissed Baxter's motion for summary judgment. CR 1592.

– 1 –

## ORAL ARGUMENT STATEMENT

Baxter Oil Service, Ltd. requests oral argument because this appeal turns on whether the administrative order issued by the Texas Commission on Environmental Quality is void, which itself turns on whether the order contains sufficient information to comply with the demands of due process. The determination of whether a notice of potential deprivation complies with due process is a fact intensive one requiring balancing three factors. No bright line rule exists. Oral argument would facilitate the Court's understanding of the facts presented below and how the balancing test applies to those facts.

## ISSUES PRESENTED

Whether the trial court erred in granting the TCEQ's plea to the jurisdiction because (1) due process clause of the 14th Amendment to the United States Constitution requires adequate notice and an opportunity to be heard before a person is deprived of a property interest by the state, (2) an administrative order that violates a person's due process rights is void; and (3) an administrative order that is void for failing to comport with due process can be collaterally attacked.

Sam Baxter ("Sam") is the owner of Baxter Oil Service, Ltd. ("Baxter"). CR 1329, 1473. He founded the small family-operated business in the fall of 1983 and has managed all aspects of Baxter's operations since that time. CR 1329, 1473. Baxter's business for over 30 years has been transporting and brokering fuel for customers who burn fuel for energy recovery, re-sell fuel, or sell blended fuel products. CR 1329, 1473. The materials Baxter sells, brokers, or otherwise uses in its business are not intended for disposal, but rather for re-use. CR 1329, 1473.

In the 1980s, Baxter sold petroleum products to the Voda Petroleum Company ("Voda Petroleum"), amongst others. CR 1329, 1473. The products Baxter sold to Voda Petroleum were intended for resale and did not require processing by Voda Petroleum. CR 1323, 1329. Sam was never an owner or operator of Voda Petroleum. CR 1373. To Sam's recollection, Baxter never transferred materials to Voda Petroleum. CR 1330, 1473. Rather, Voda Petroleum picked up the products from Baxter. CR 1330, 1473. Baxter sold to Voda Petroleum products such as No. 4 oil, naptha, transformer oil, on-spec used oil fuel, natural gas condensate, and "'light ends.'" CR 1329, 1473. Baxter had other customers for these products. CR 1329, 1474. However, Baxter chose to sell to Voda Petroleum because Baxter was able to charge it higher prices. CR 1330, 1473.

Voda Petroleum had complete control over the products it bought from Baxter. CR 1330, 1475. Baxter had no role in making waste disposal decisions, or any decisions for that matter, for Voda Petroleum. CR 1330, 1475. The only business Baxter had with Voda Petroleum was selling fuel products for use or resale. CR 1323–24, 1475. Waste disposal was never part of Baxter's business with Voda Petroleum. CR 1324, 1330, 1475. Sam had no knowledge of any disposal occurring at Voda Petroleum's facility. CR 1330, 1475.

Voda Petroleum's facility (the "Voda Site") sat on 6.12 acres of land in Gregg County, Texas. CR 445. Appellee, the Texas Commission on Environmental Quality ("TCEQ"), contends that the Voda Site was used as a waste oil recycling facility from 1981 to 1991. *Id.* In 1995, the TCEQ conducted an investigation to determine if Voda Petroleum's operations caused environmental contaminants to enter the groundwater or soil at the Voda Site. *Id.* After conducting investigations into a site's potential risk to public health and the environment resulting from releases or potential releases of hazardous substances, a site is given a Hazard Ranking System ("HRS") score. *Id.* The HRS score assigned to the Voda Site by the TCEQ was not severe enough to qualify the Voda Site as federal "Superfund Site." *Id.* The TCEQ referred the matter to the United States Environmental Protection Agency (the "EPA"). *Id.*

The EPA investigated the Voda Site and on March 27, 1996, issued an action memorandum. CR 446. That action memorandum stated that the Voda Site contained hazardous substances, had received crude oil, and had large quantities of oil that were subject to the United States Clean Water act and the United States Oil Pollution Act. *Id.* As part of the EPA's removal action, various sources of contamination were removed from the Voda Site. *Id.* By late 1997, the EPA's remediation efforts were completed. *Id.* On-site soil and ground-water was tested and the results showed that the EPA's efforts had minimized threats of direct human contact and inhalation. *Id.* The EPA sought to recover its removal costs from various potentially responsible parties. *Id.* Although Baxter denied liability, in 2000 it settled the EPA's demand for cleanup costs for $10,000. CR 1324.

Three years after the EPA concluded its removal action, the TCEQ proposed listing the Voda Site on the State Superfund Registry on November 17, 2000. CR 447. The TCEQ never re-scored the Voda Site under the HRS following the EPA's removal action. *Id.* From 2001 to 2008, the TCEQ conducted remedial investigations and a feasibility study at the Voda Site. CR 448.

After years of investigations, the TCEQ issued the Voda Site State Superfund Order ("the Order") pursuant to section 361.188 and 361.272 of the Texas Health & Safety Code on February 12, 2010. CR 1733–1812. The Order, when counting the accompanying exhibits, is 79 pages long. *Id.* Numerous obligations are

imposed on the "responsible parties," such as: (1) reimbursing the TCEQ for its past investigative costs, CR 1758; (2) designing and implementing a remedial action, CR 1761–74; and (3) obtaining Post Construction Financial Assurance, CR 1773–74. Nothing in the Order, including its exhibits, stated that Baxter was liable for any amounts of money. CR 1733–1812. Nothing in the Order, including its exhibits, stated that the Order was final and appealable. *Id.* Nothing in the Order, including its exhibits, stated that Baxter or any of the other potentially responsible parties had the right to appeal the Order. *Id.* And nothing in the Order, including its exhibits, stated how much the Voda Site's remediation efforts will cost. *Id.*

The Order was accompanied by a short cover letter, simply stating to "[p]ersons on the attached mailing list . . . [e]nclosed is a copy of an administrative order issued by the Commission regarding the above referenced matter. Should you have any questions, please contact . . . [the] Chief Clerk." CR 1813. That letter was sent to Baxter and hundreds of other potentially responsible parties on February 19, 2010. CR 1813–31.

Young Chevrolet, Inc., a potential responsible party listed on the Order, initiated the proceeding below on March 12, 2010, by filing suit against the TCEQ to appeal the Order. CR 5–110. Other potentially responsible parties filed lawsuits against the TCEQ, and on May 18, 2010, all of the cases involving the Voda Site were

– 6 –

consolidated in the trial court. CR 221–245. On August 8, 2011, the TECQ filed a counterclaim against all the plaintiffs in the pending actions and in the same pleading, instituted a third-party action against numerous potentially responsible parties who did not appeal the Order. CR 283–424. Baxter was one of these third-party defendants. CR 303. On March 12, 2012, Sam, on behalf of Baxter, sent a letter to counsel for the TCEQ in response to the Order, enclosing an answer setting forth Baxter's defenses to liability under the Order. CR 1883–85. On November 15, 2013, Baxter, through counsel, filed an answer in the proceeding below. CR 578–81.

Baxter filed a motion for summary judgment on March 27, 2015, on the grounds that Baxter negated two essential elements of the TCEQ's third-party lawsuit because Baxter did not send solid waste to the Voda Site and never intended to dispose of solid waste at the Voda Site. CR 1458–1581. On April 17, 2015, the TCEQ filed a plea to the jurisdiction, requesting the district court to dismiss Baxter's summary judgment motion. CR 1582–1703. The TCEQ contended that the Order was final and unappealable and could not be collaterally attacked by Baxter. CR 1588–92. The district court granted the TCEQ's plea to the jurisdiction on June 29, 2015, dismissing Baxter's motion for summary judgment without consideration of the merits. CR 1952. This appeal followed. CR 1953–55.

## SUMMARY OF THE ARGUMENT

The trial court erred in granting the TCEQ's plea to the jurisdicton. By the Order entered in connection with the Voda Site, the TCEQ attempts to impose monetary obligations on Baxter. Baxter is entitled to due process before it is deprived by the TCEQ of such property. Due process requires both adequate notice and an opportunity to be heard. The Order fails to comport with due process because it does not provide adequate notice. Specifically, the Order not only fails to inform Baxter of its appellate remedies, but affirmatively misrepresents the finality of the Order. The Order also fails to inform Baxter of the possible scope of its liability, thereby depriving Baxter of key information necessary to determining a proper response.

Because the Order fails to comport with due process, it is void. And because the Order is void, it may be collaterally attacked. Accordingly, the TCEQ's plea to the jurisdiction, which argued that Baxter could not collaterally attack the Order by means of a summary judgment motion, was without merit.

## I. Baxter Was Deprived of Due Process

### A. Baxter Is Entitled To Due Process

The Fourteenth Amendment to the Constitution of the United States provides that no person shall be deprived of property without due process of law.[1] In *Fuentes v. Shevin*, 407 U.S. 67 (1972), the United States Supreme Court observed:

> The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment – to minimize substantively unfair or mistaken deprivations of property.

*Id.* at 80–81; *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.'") (quoting *Joint Anti-Facist Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring)).

Although the required procedures may vary according to the interests at stake in particular contexts,[2] "the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"

---

[1] Article 1, section 19 of the Texas Constitution states: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."

[2] *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971).

*Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The United States Supreme Court has specifically held that "the Due Process Clauses protect civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances." *Logan v. Zimmerman Brush Co.*, 455 U.S 422, 429 (1982). Arguing by analogy to cases involving the right of access to courts, *Logan* reaffirmed a long line of cases upholding the fundamental nature of the right to be heard:

> [A]t least where interests of basic importance are involved, "absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard."

*Logan*, 455 U.S. at 430 n.5 (quoting *Boddie*, 401 U.S. at 377). The Supreme Court has "described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Boddie,* 401 U.S. 379).

Baxter, like all United States citizens, is entitled to due process. The Order and the TCEQ's third-party lawsuit against Baxter demonstrate that the TCEQ seeks to deprive Baxter of property – a certain portion of the potentially millions of dollars it will cost to remediate the Voda Site. CR 1448. The amount of money Baxter

may be liable for could be substantial. Therefore, before the TCEQ can deprive Baxter of its property – in this case money – Baxter is entitled to due process.

**B. "Adequate" Notice is an Essential Element of Due Process**

In order to be afforded an opportunity to be heard, a party must have notice of the opportunity. For this reason, the United States Supreme Court has repeatedly recognized that the "essence of due process" requires that a person whose property interests are in jeopardy receive both "'notice of the case against him and an opportunity to meet it.'" *Mathews*, 424 U.S. at 348 (quoting *McGrath*, 341 U.S. at 171–72 (Frankfurter, J., concurring)).

Texas courts are equally adamant that due process demands adequate notice. "[N]otice must be reasonably calculated to inform parties of proceedings which may directly and adversely affect their legally protected interests." *Houston v. Fore*, 412 S.W.2d 35, 39 (Tex. 1967) (citing *Walker v. City of Hutchison*, 352 U.S. 112 (1956)); *see, e.g., Valero South Texas Processing Co. v. Starr County Appraisal District*, 954 S.W.2d 863 (Tex. App.—San Antonio 1997, no writ) ("In other words, to meet the constitutional requirement of due process, the notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *see also Mosser v. Plano Three Venture*, 893 S.W.2d 8, 12–13 (Tex. App.—Dallas 1994, no writ) (holding that it is a "fundamental requirement of

due process" to provide sufficient notice that "apprise[s] interested parties of the pendency of the action and afford them an opportunity to respond"); *Langdale v. Villamil*, 813 S.W.2d 187 (Tex. App.—Houston [14th Dist.] 1991, no writ) ("A fundamental element of due process is adequate and reasonable notice of proceedings."); *Williams v. Holley*, 653 S.W.2d 639, 640 (Tex. App.—Waco 1983, writ ref'd n.r.e.) ("The right of a party to be heard in a contested case is fundamental and failure to give adequate notice of the trial setting constitutes lack of due process."); *City of Waco v. Roddey*, 613 S.W.2d 360, 365 (Tex. App.—Waco 1981, no writ) ("'Procedural due process' requires notice that is reasonably calculated to inform parties of proceedings that may directly and adversely affect their legally protected interests.").

The Supreme Court has emphasized that "when notice is a person's due . . . [t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane v. Central Hanover Bank Trust Co.*, 339 U.S. 306, 315 (1950). In other words, notice is "adequate" only when it "inform[s] the recipient of a procedure for resolving disputes and . . . provide[s] a reasonable length of time to employ that procedure." *Bradford v. Edelstein*, 467 F. Supp. 1361, 1373 (S.D. Tex. 1979). Adequate notice should thus "specify the nature of the facts and evidence" at issue in order to allow "the affected party to prepare an informed response." *Hess & Clark, Division of*

*Rhodia, Inc. v. Food and Drug Administration*, 495 F.2d 975, 983 (D.C. Cir. 1974); *see also Wolff v. McDonnell*, 418 U.S. 539, 564 (1974) ("[p]art of the function of notice is to give the charged party a chance to marshall the facts in his defense and to clarify what the charges are, in fact"). In addition, a party must be notified in advance of the *precise issues* to be raised at a hearing. *In re Ruffalo*, 390 U.S. 544, 550 (1968); *Navato v. Sletten*, 560 F.2d 340 (8th Cir. 1977); *North Alabama Express, Inc. v. United States*, 585 F.2d 783, 786 (5th Cir. 1978) (citing *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 143 (1940)).

Notice cannot be adequate when it is misleading. Misleading notices thus violate due process. *Gonzalez v. Sullivan*, 914 F.2d 1197, 1203 (9th Cir. 1990) (holding that misleading notice violates due process because it "introduces a high risk of error into the . . . decisionmaking process"); *Baxter v. Colvin*, No. 14-CV-01306, 2014 WL 6985149, at *4 (N.D. Cal. Dec. 10, 2014) (citing to *Gonzalez*, 914 F.2d at 1203, in holding that an "ambiguous and misleading" order violates due process "because it did not clearly inform plaintiff how and whether she could pursue her right to an oral hearing with the ALJ while also objecting to his decision on its merits"); *Butland v. Bowen*, 673 F. Supp. 638, 641 (D. Mass. 1987) ("Notice that affirmatively misleads…clearly violates the Constitutional guarantee of due process.").

Because due process is required by the United States Constitution, a party's due

process rights may be violated even when a state follows its own procedures. *Logan*, 455 U.S. at 432 ("Each of our due process cases has recognized, either explicitly or implicitly, that because 'minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action."); *Peralta v. Heights Med. Ctr. Inc.*, 485 U.S. 80, 86 (1988) (concluding that Texas bill-of-review requirements must yield to constitutional demands of due process). "Although [a government agency] is under no obligation to employ *extraordinary* means to notify an interested party, when the government has in its possession information that would enable it to provide adequate notice to an interested party," it must do so. *Barrera-Montenegro v. United States,* 74 F.3d 657, 660 (5th Cir. 1996) (emphasis added). Assessing the adequacy of a particular form of notice requires balancing the "interest of the State" against "the individual interest sought to be protected by the Fourteenth Amendment." *Mullane,* 339 U.S. at 314. Since 1976, the test for determining whether notice is adequate to satisfy due process balances three factors: (1) the private interest at stake; (2) the risk of an erroneous deprivation along with the value of additional notice; and (3) the burden imposed on the government by the additional notice. *Mathews*, 424 U.S. at 335.

## C. The Notice to Baxter Did Not Provide Baxter Sufficient Information

Assuming for the sake of argument that the Order was the TCEQ's attempt to give notice to Baxter of the imminent deprivation of his property, the Order failed to comport with due process in two ways. First, the Order did not provide Baxter with notice of the right to appeal the Order and in fact was misleading on this point thereby leaving Baxter with insufficient information with which to determine how to fight the Order. Second, the Order did not provide Baxter with any information about the extent of the property deprivation, thereby leaving Baxter with insufficient information with which to determine whether to fight the Order.

### 1. The TCEQ Did Not Provide Any Notice of the Right to Appeal the Order

The TQEC's communications to the Voda Superfund Site Potential Responsible Persons ("PRPs") such as Baxter were not reasonably calculated to inform them of an opportunity for a hearing. The TCEQ failed to provide any indication that the Order could be appealed or the consequences of not appealing, namely that Baxter could be liable for millions of dollars of response costs and other financial obligations. This failure violated Baxter's due process right to an adequate notice.

The cover letter to the Order (addressed to "Persons on the attached mailing list") consists of a two-sentence communication from the Chief Clerk of the TCEQ. CR 1813. The first sentence merely indicates that a copy of the administrative order is enclosed. *Id.* The second sentence states: "Should you

have any questions, please contact … the Chief Clerk." *Id.* Nothing in the cover letter indicates that Baxter or the other PRPs have the right to be heard to challenge the Order.

Likewise, nothing in the 62–page Order itself even hints that a PRP has any right to be heard in a challenge to the Order. CR 1733–94. Although the Order contains references to various sections of the Texas Solid Waste Disposal Act, not one of those references is to the section of that Act that explains how to challenge the Order. Consequently, a PRP reading the entirety of the Order, its exhibits and the cover letter would not acquire a single clue that a PRP has an opportunity to appeal the Order.

To the contrary, the Order is misleading in that it creates the impression that no right to appeal exists. A PRP reading the Order and getting to page 60 (and looking for some chance to object to the Order) might be encouraged by § XXXII, titled "Opportunity to Conference." CR 1792. However, the final sentence to section B of § XXXII makes clear that "The conference is not an evidentiary hearing, does not constitute a proceeding to challenge this AO, and *does not give Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties the right to seek review of this AO.*" *Id.* (emphasis added). Although this would have been one logical place to provide

some notice to PRPs of the right to challenge the Order, no mention is made of a PRP's right to seek judicial review of the Order.

The express denial of any "right to seek review" of the Order expressed in § XXXII is reinforced by § XXXV titled "Sovereign Immunity." CR 1793. The first sentence of § XXXV states: "The Parties hereby agree that nothing in this AO waives the State of Texas' sovereign immunity relating to suit, liability, and the payment of damages." CR 1793. To a PRP not familiar with section 361.321 of the Solid Waste Disposal Act, § XXXV suggests that Texas' sovereign immunity precludes any opportunity to sue the State of Texas in order to challenge the Order. Section XXXV would have been another logical place to provide some notice to PRPs of a PRP's right to seek review of the Order. But the lay reader of this clause is understandably left with the impression that taking on the State of Texas, shielded as it is by sovereign immunity, would be against the law.

It is undisputed that a party has a due process right to be notified of trial settings or other procedural requirements. In such cases, a party's rights to confront the adverse party and to present evidence to a court are at stake – and adequate notice

is essential for a party to activate those rights.[3]  In other words, "the right to a hearing is meaningless without notice."  *Walker*, 352 U.S. at 114.

The TCEQ's failure to notify Baxter of the opportunity to be heard is directly analogous.  Receiving the Order, even by certified mail, is meaningless if nothing in the Order, its exhibits, the cover letter or any other communication from the TCEQ to the PRPs indicates that there is a right to appeal the Order. *See Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 45 (1978) (holding that notice to a utility's customers was insufficient to satisfy due process because it was not reasonably calculated to inform them of an opportunity for a hearing); *Bradford*, 467 F. Supp. at 1373 (holding that for notice to be adequate, "it must inform the recipient of a procedure for resolving disputes").

## 2. Constructive Notice of Appellate Rights Is Inadequate Given the Circumstances and Conditions of This Case

Baxter acknowledges that the procedure for challenging the Order is contained in sections 361.321 and 361.322 of the Texas Health and Safety Code. As described above, however, the Order is affirmatively misleading.  It informs the

---

[3] *See L.B.L. Oil Co. v. Int'l Powers Serv., Inc.*, 777 S.W.2d 390, 391 (Tex. 1989) (notice of post-answer default); *Lopez v. Lopez,* 757 S.W.2d 721, 723 (Tex. 1988) (notice of trial setting); *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex. 1986); *Stubbs v. Stubbs,* 685 S.W.2d 643, 645 (Tex. 1985) (required statement of facts not filed); *Misium v. Misium*, 902 S.W.2d 195 (Tex. App.—Eastland 1995, no writ); *Moss v. Malone*, 880 S.W.2d 45, 51 (Tex. App.—Tyler 1994, writ denied); *Tramco Enter., Inc. v. Indep. Am. Sav. Ass'n,* 739 S.W.2d 944, 948 (Tex. App.—Fort Worth 1987, no writ) (required notice of trial setting); *Chow v. Dole,* 677 S.W.2d 220 (Tex. App.—Houston [1st Dist.] 1984, no writ) (required trial setting); *Rotello v. State,* 492 S.W.2d 347, 349 (Tex. Civ. App.—Houston [1st Dist.] 1973, writ ref'd n.r.e., per curiam).

reader that the TCEQ has sovereign immunity, discusses an "Opportunity to Conference" that that does not constitute a challenge to the Order, and otherwise implies that the Order is non-appealable. CR 1792–93. The Order's misleading nature violated Baxter's due process rights.

While certain case law might seem to indicate that publically-available statutes are sufficient to satisfy due process, the cases are distinguishable. For example, in *City of West Covina v. Perkins,* 525 U.S. 234 (1999), the United States Supreme Court stated that "in prior cases in which we have held that post-deprivation state-law remedies were sufficient to satisfy the demands of due process and the laws were public and available, we have not concluded that the State must provide further information about those procedures." *Id.* at 241. However, the holding in *West Covina* was articulated in the context of the specific deprivation at issue in that case, i.e., the deprivation of personal property[4] by the police for a criminal investigation. *Id.* at 240 ("When the police seize property for a criminal investigation, however, due process does not require them to provide the owner with notice of state-law remedies."). *West Covina* is distinguishable, however, because in that case the plaintiff was provided with specific information about his remedy: "One of the detectives told Perkins he needed to obtain a court order

---

[4] In the *West Covina* case, "the police seized a number of items, including photos of Marsh [the suspect in the homicide], an address book, a 12–gauge shotgun, a starter pistol, ammunition, and $2,629 in cash." In contrast, the owners of Baxter face the loss of their business (their only source of income) and all of their property and savings.

– 19 –

authorizing the property's return." *Id.* at 237. Here, Baxter was not provided with any similar information about its rights or a potential remedy and instead was misled about the availability of those remedies.

The *West Covina* decision, while citing *Mullane*, did not refer to *Mullane's* "notice reasonably calculated" standard or even attempt to apply it. *Id.* at 240. The United States Supreme Court has subsequently endorsed *Mullane's* "notice reasonably calculated" standard. *See, e.g., Dusenbery v. United States*, 534 U.S. 161 (2002) (three years after the *West Covina* decision); *Jones v. Flowers*, 547 U.S. 220 (2006) (four years after the *West Covina* decision). It is fair to conclude that the "notice reasonably calculated, under all the circumstances" standard remains the relevant and appropriate method of analysis.

The Texas Supreme Court applied *City of West Covina* in another property seizure case in *City of Dallas v. VSC, LLC*, 347 S.W. 3d 231 (Tex. 2011). In *VSC*, the city's police department seized a number of vehicles from VSC, a licensed vehicle storage facility. *Id.* at 234. Several days after the initial seizure, VSC sued the city, asserting a lien for fees related to the vehicles' storage and contending that the city's actions amounted to an unconstitutional taking. The Texas Supreme Court observed that "[t]he facts in this case mirror those in *West Covina.* The police legally seized VSC's property, and VSC was aware of what property was seized and by whom." *Id.* at 239. Describing the key factor in *West Covina*, the

– 20 –

Texas Supreme Court observed that "[r]ather than seek a court order, Perkins sued the officers and alleged that the remedies for the property's return did not satisfy due process." *Id.* at 238–39. In other words, VSC, represented by counsel, took immediate legal action but chose the wrong potential remedy. The Texas Supreme Court concluded "that VSC's actual notice of the vehicles' seizures was constitutionally sufficient and that it therefore had the burden of pursuing the chapter 47 remedy" that the court held was proper. *Id.* at 238. Citing to the Texas Code of Criminal Procedure, the court pointed out that "[e]ven if it failed to participate in the chapter 47 proceedings, VSC might have had, in certain cases, a second post-deprivation option available to it."

Unlike VSC, Baxter has no such second option. In stark contrast to the facts in *West Covina* and *VSC*, Baxter, unrepresented by counsel, was confronted with a lengthy, misleading Order that offered no information connecting Baxter to the Voda Site and strongly implied that the Order was final and could not be challenged.

Due process is flexible and what constitutes adequate notice varies according to the facts and circumstances of each case. Neither *West Covina* nor *VSC* hold that statutory notice is always sufficient to satisfy due process. To the contrary, the Texas Supreme Court acknowledged that the United States Supreme Court has "recognized 'the impossibility of setting up a rigid formula as to the kind of notice

– 21 –

that must be given.'" *Id.* at 238 (quoting *Walker,* 352 U.S. at 115). Instead, the "notice required will vary with circumstances and conditions." *Id.*

Adequate notice based on the facts and circumstances in *West Covina* and *VSC* does not amount to adequate notice to Baxter. As discussed below, applying the appropriate test, Baxter was entitled to notice of its appellate rights in the Order.

### 3. The TCEQ Did Not Provide Adequate Notice of the Issues or Consequences

In addition to notice of the right to be heard, due process requires that "the notice as published must reasonably apprise any interested person of the issues involved in the proceeding." *Buckner Trucking, Inc. v. United States*, 354 F. Supp. 1210, 1219 (S.D. Tex. 1973). The Order contains a maze of cross-references that would confuse anyone but an experienced Superfund attorney but it does not contain any information about the extent of possible remedial costs. In addition to failing to give adequate notice of the right to be heard, therefore, the Order failed to give Baxter adequate notice of the issues or consequences to Baxter.

Except for the fact that Baxter was on the Order's mailing list, nothing in the TCEQ's Order provides any information linking Baxter to the Voda Site. The Order is confusing as to whether Baxter is even liable and, therefore, subject to the Order's financial obligations. Section II.A lists the entities (including Baxter) that are referred to as "potentially responsible parties" or

"PRPs." CR 1733–49. Then, without any supporting finding of fact or analysis, all of the potentially responsible parties are suddenly and automatically transformed into "responsible parties" by Conclusion of Law and Determination III.A on page 25 of the Order. CR 1757. No explanation is given in the Order or elsewhere as to how this transformation occurred. Although the Texas Solid Waste Disposal Act does not define "potentially responsible parties," the word "potential" and its adverb form "potentially" have commonly accepted dictionary definitions such as "existing in possibility, not in actuality . . . expressive of possibility; as a *potential* use." *Webster's New International Dictionary of the English Language* 1932 (2nd ed. 1935). Consequently, a PRP such as Baxter might reasonably conclude that because it has been designated a "potentially responsible party" something more must be done (such as a fact-finding hearing) to transform him from a *possible* responsible party into an *actual* responsible party.

Likewise, the Order fails to explain the possible scope of its consequences. While it describes possible penalties for failing to comply, CR 1785–88, it does not even hint at the possible financial exposure, let alone explain that Baxter could be liable for millions of dollars in remedial obligations. Such notice did not provide Baxter sufficient information of a potential deprivation of its property. A challenge to the Order, assuming Baxter somehow knew that it was entitled to one, would be enormously expensive to a small business. The only knowledge of the potential

size of the loss faced by Baxter was with the TCEQ. Given this fact, and the confusing nature of the Order, the TCEQ had a legal and constitutional duty to explicitly describe the implications to Baxter to allow Baxter to decide whether to challenge the Order.

**D. Because it Lacked Sufficient Information, the Order Violated Due Process and Was Void**

Assessing the adequacy of a particular form of notice requires balancing the "interest of the State" against "the individual interest sought to be protected by the Fourteenth Amendment." *Mullane,* 339 U.S. at 314. Since 1976, the test for determining whether notice is adequate to satisfy due process balances three factors: (1) the private interest at stake; (2) the risk of an erroneous deprivation along with the value of additional notice; and (3) the burden imposed on the government by the additional notice. *Mathews*, 424 U.S. at 335.

Applying the three-part balancing test to the situation before the Court reflects that the notice to Baxter was not adequate to satisfy due process. With respect to the criterion of the private interest at stake, the Order itself provides the evidence. Although the Order is silent on the potential scope of harm, PRPs that are subject to the Order face apparently unlimited financial costs, burdens, and risks. In addition to the multi-million dollar remediation project at the Voda Petroleum Superfund Site, those subject to the Order must pay for a long-term, post construction insurance, bond or its equivalent. CR 1773–74. In addition, if

– 24 –

permits are required to carry out the Order, the responsible parties must obtain them and incur all consequent expenses.  CR 1760.

For Baxter, a very small, family-owned business, the financial obligations and requirements set forth in the Order could be devastating.  All of its meager assets would be quickly consumed if it were compelled by the TCEQ to make even a small portion of the expenditures required by the Order.

The second factor consists of two components:  the risk of an erroneous deprivation along with the value of additional notice.  *Mathews*, 424 U.S. at 335.  The risk of an erroneous deprivation is demonstrated by Baxter's motion for summary judgment – Baxter did not generate any solid waste.  CR 1464–67.  Baxter sold only valuable and useful fuel products to Voda as it has to all of its other customers since 1983.  CR 1473.  In fact, Baxter sold products to Voda Petroleum over other customers because Voda Petroleum paid higher prices.  *Id.*  Based on federal cases interpreting federal environmental protection statutes and regulations that are similar to the Texas Solid Waste Disposal Act, Baxter should not be liable in any way for the remediation costs at the Voda Site and therefore was erroneously held liable in the Order.  *See Vine St. LLC v. Borg Warner Corp.*, 776 F.3d 312, 317–19 (5th Cir. 2015); *see also Consolidation Coal Co. v. Georgia Power Co.*, 781 F.3d 129, 147–49 (4th Cir. 2015).

The value of additional notice, that is, the value of a notice that would have informed Baxter and the other PRPs of their right to appeal the Order and more clearly informed them of the implications, is virtually self-evident. In addition to securing a right to appeal the Order, additional (i.e. adequate) notice leading to a hearing or other presentation of the issues and evidence would serve to clarify the liability issues at an earlier stage of the proceedings. This would avoid the unnecessary expenditure of the Court's resources – as well as the resources of the parties, including the TCEQ.

The third factor – the burden on the government of additional notice – also weighs in Baxter's favor because the TCEQ's burden would be miniscule. Consider the burden that would be imposed on the TCEQ by adding the following five simple sentences to the cover letter to the Order:

> You have been found liable for response costs and other obligations as set forth in the attached Order. Those costs could exceed $_____. Pursuant to section 361.321 and/or 361.322 of the Texas Health and Safety Code, you have the right to appeal this Order. Your appeal must be filed with the TCEQ within 30 days of the date of this Order. Failure to file an appeal will adversely affect your right to challenge this Order.

These five sentences (or a similarly concise notice) would not even require a second page for the TCEQ's cover letter. The amount of additional ink required by this notice would be negligible. *Gonzalez*, 914 F.2d at 1203 at 1203 ("Requiring notices to accurately state how a claimant might appeal an initial decision does not

impose a significant financial or administrative burden on the Secretary.").  For all practical purposes this additional notice would require no additional expense or effort by the TCEQ.

Accordingly, the *Mathews* factors weigh in favor of Baxter.  To comply with due process, the Order should have contained at least a range of possible expense and some kind of notice of a potentially responsible party's appellate remedies. Because it did not, the Order was void.  *See Security State Bank & Trust v. Bexar Cty.*, 397 S.W.3d 715, 723 (Tex. App.—San Antonio 2012, pet. denied); *see also N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 143 (5th Cir. 1996) (holding that a judgment is void if a court that rendered it "acted in a manner inconsistent with due process"); *In re Guardianship of B.A.G.*, 794 S.W.2d 510, 513 (Tex. App.— Corpus Christi 1990, no writ) (holding that a guardianship order entered in violation of due process is void).

## II. Because the Order is Void, it May be Collaterally Attacked at Any Time and the Trial Court Erred in Granting the TCEQ's Plea to the Jurisdiction

As Baxter demonstrated above, the Order is void because the lack of notice to Baxter of appellate remedies and the scope of the financial consequences of the Order violates Baxter's due process rights.  A void administrative agency's order can be collaterally attacked.  *City of Celina v. Dynavest Joint Venture* 253 S.W.3d 399, 403 (Tex. App.—Austin 2008, no pet.) *rev'd on other grounds,*

*Rusk State Hospital v. Black*, 392 S.W.3d 88 (Tex. 2012). Void administrative orders that violate a person's due process rights should be subject to collateral attacks, just like void judgments. *See, e.g., In re E.R.,* 385 S.W.3d 552, 566 (Tex. 2012); *Security State Bank and Trust*, 397 S.W.3d at 723–24 (holding that a judgment is void and subject to collateral attack where a person's due process rights were violated).[5]

No set procedure or statute of limitations exists for a collateral attack. *In re E.R.*, 385 S.W.3d at 566; *Roman Catholic Diocese of Dallas v. County of Dallas Tax Collector*, 228 S.W.3d 475, 480 (Tex. App.—Dallas 2007, no pet.). A statutory time frame to act in a direct attack does not have any bearing on a collateral attack involving a due process violation – a collateral attack is permissible even if done well beyond a statutory deadline. *In re E.R.*, 385 S.W.3d at 566 ("Despite the Legislature's intent to expedite termination proceedings, it cannot do so at the expense of a parent's constitutional right to notice."). In other words, there was no time-bar to Baxter's collateral attack.

---

[5] Baxter recognizes that some cases have described only two circumstances under which administrative orders are void in a manner that subjects them to collateral attack – when an agency exceeds its authority or when an order is procured by extrinsic fraud. *See Chocolate Bayou Water Co. & Sand Supply v. Tex. Natural Res. Conserv. Comm'n*, 124 S.W.3d 844, 853 (Tex. App.—Austin 2003, pet. denied); *Lesikar v. Rappeport*, 33 S.W.3d 282, 613 (Tex. App.—Texarkana 2000, no pet.). Those cases did not involve orders entered without adequate notice and thus the courts had no opportunity to consider the implications of an order entered in violation of due process. Orders that fail to comply with due process are void. *See Security State Bank & Trust*, 397 S.W.3d at 723; *see also N.Y. Life Ins. Co.*, 84 F.3d at 143; *In re Guardianship of B.A.G.*, 794 S.W.2d at 513. The types of void orders subject to collateral attack should thus include constitutionally infirm orders.

The only basis for the TCEQ's plea to the jurisdiction was its claim that Baxter's summary judgment motion was an improper collateral attack on the Order. CR 1587–92. Because Baxter was entitled to collaterally attack the void Order at any time, there was nothing depriving the trial court of jurisdiction to hear Baxter's summary judgment motion. The trial court therefore erred in granting the TCEQ's plea to the jurisdiction.

## CONCLUSION AND PRAYER

"When notice is a person's due, process which is a mere gesture is not due process." *Mullane*, U.S. at 657. In this case, although Baxter received the Order, nothing in the Order, its cover letter, or its exhibits explained the scope of the possible ramifications of the Order to Baxter and nothing in the Order, its cover letter, or its exhibits even hinted that Baxter had a right to appeal the Order. To the contrary, the Order suggested that it was final and not subject to challenge.

This "process" does not even rise to the level of a mere gesture. The TCEQ's "process' was not reasonably calculated to inform parties of proceedings that may directly and adversely affect their legally protected interests." *Houston*, 412 S.W.2d at 35. Obviously, the TCEQ was not "desirous of actually informing" Baxter and the other PRPs of their right to protect their interests. It would be fundamentally unfair and a clear violation of the United States Constitution for Baxter to be deprived of its property in such a manner.

– 29 –

Because the Order was void, Baxter's motion for summary judgment was a permissible collateral attack. Therefore, this Court should reverse the decision of the district court granting the TCEQ's plea to the jurisdiction and remand so that the district court can consider Baxter's summary judgment motion.

WHEREFORE, Appellant Baxter Oil Service, Ltd. prays that the trial court's order granting Appellee's plea to the jurisdiction be reversed and this case remanded for further proceedings on Baxter's summary judgment motion. Appellant prays for such other relief to which it is entitled.

Respectfully submitted,

**PULMAN, CAPPUCCIO,
PULLEN, BENSON & JONES, LP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Leslie Sara Hyman*
Elliott S. Cappuccio
Texas State Bar No. 24008419
ecappuccio@pulmanlaw.com
Leslie Sara Hyman
Texas State Bar No. 00798274
lhyman@pulmanlaw.com
Etan Z. Tepperman
Texas State Bar No. 24088514
etepperman@pulmanlaw.com

**ATTORNEYS FOR APPELLANT**

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)((3), I certify that, excluding those parts allowed to be excluded, the above and foregoing Brief of Appellant contains 7,096 words.



/s/ Leslie Sara Hyman
Leslie Sara Hyman

## CERTIFICATE OF SERVICE

I certify that on the 25th day of September 2015, the foregoing Brief of Appellant was served in accordance with the Texas Rules of Appellate Procedure addressed as follows:

*Via Email to thomas.edwards@texasattorneygeneral.gov:*
Mr. Thomas H. Edwards
*Via Email to craig.pritzlaff@texasattorneygeneral.gov:*
Mr. Craig Pritzlaff
Office of the Attorney General
Environmental Protection Division
P. O. Box. 12548, Capitol Station
Austin, Texas  78711

/s/ Leslie Sara Hyman
Leslie Sara Hyman

No. 03-15-00446-CV

IN THE
COURT OF APPEALS FOR THE
THIRD COURT OF APPEALS DISTRICT
AUSTIN, TEXAS

———————

BAXTER OIL SERVICE, LTD.
APPELLANT

VERSUS

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
APPELLEE

———————

APPEAL FROM THE 345TH JUDICIAL DISTRICT COURT, TRAVIS COUNTY, TEXAS
NO. D-1-GN-10-000772

APPENDIX TO BRIEF OF APPELLANT

| Tab | Description |
|---|---|
| 1 | Order Granting the TCEQ's Plea to the Jurisdiction – CR 1952 |
| 2 | Fourteenth Amendment to the United States Constitution |
| 3 | February 12, 2010 Texas Commission on Environmental Quality Administrative Order – CR 1733-1812 |

{00050417}

# Tab 1

# Tab 1

Filed in The District Court
of Travis County, Texas

JUN 2 9 2015

At_____11:26____Am.NS

Velva L. Price, District Clerk

CAUSE NO. D-1-GN-10-000772

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT OF |
| | § | |
| VODA PETROLEUM STATE | § | TRAVIS COUNTY, TEXAS |
| | § | |
| SUPERFUND SITE LITIGATION | § | 345th JUDICIAL DISTRICT |

## ORDER GRANTING TCEQ'S PLEA TO THE JURISDICTION AS TO BAXTER'S MOTION FOR SUMMARY JUDGMENT

On April 17, 2015, the Texas Commission on Environmental Quality (TCEQ), Defendant, filed a Plea to the Jurisdiction seeking to dismiss the Motion for Summary Judgment filed by Baxter Oil Service, Ltd. ("Baxter"). After considering the motion, the pleadings, the documents on file and the arguments of counsel, the Court GRANTS the TCEQ's plea.

It is therefore ORDERED that the Motion for Summary Judgment filed by Baxter is dismissed.

SIGNED this 29th day of _____June_____ 2015.



AMY CLARK MEACHUM
DISTRICT JUDGE

004095242



1952

# Tab 2

Tab 2

United States Code Annotated
 Constitution of the United States
  Annotated
   Amendment XIV. Citizenship; Privileges and Immunities; Due Process; Equal Protection;
   Apportionment of Representation; Disqualification of Officers; Public Debt; Enforcement

U.S.C.A. Const. Amend. XIV-Full Text

AMENDMENT XIV. CITIZENSHIP; PRIVILEGES AND IMMUNITIES; DUE PROCESS; EQUAL
PROTECTION; APPOINTMENT OF REPRESENTATION; DISQUALIFICATION OF OFFICERS; PUBLIC
DEBT; ENFORCEMENT

Currentness

**Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Section 2.** Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

**Section 3.** No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

**Section 4.** The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.** The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

<Section 1 of this amendment is further displayed in separate documents according to subject matter,>

<see USCA Const Amend. XIV, § 1-Citizens>

<see USCA Const Amend. XIV, § 1-Privileges>

<see USCA Const Amend. XIV, § 1-Due Proc>

<see USCA Const Amend. XIV, § 1-Equal Protect>

<sections 2 to 5 of this amendment are displayed as separate documents,>

<see USCA Const Amend. XIV, § 2,>

<see USCA Const Amend. XIV, § 3,>

<see USCA Const Amend. XIV, § 4,>

<see USCA Const Amend. XIV, § 5,>

U.S.C.A. Const. Amend. XIV-Full Text, USCA CONST Amend. XIV-Full Text
Current through P.L. 114-49 approved 8-7-2015

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 3

# Tab 3



## DOCKET NUMBER 2009-1706-SPF

| | | |
|---|---|---|
| IN THE MATTER OF | § | BEFORE THE |
| THE SITE KNOWN AS | § | TEXAS COMMISSION ON |
| VODA PETROLEUM, INC. | § | ENVIRONMENTAL QUALITY |
| STATE SUPERFUND SITE | § | |

## AN ADMINISTRATIVE ORDER

I.  Introduction

On ___February 10, 2010___, the Texas Commission on Environmental Quality ("Commission" or "TCEQ") considered the Executive Director's ("ED") allegations of the existence of a release or threat of release of solid wastes and/or hazardous substances into the environment on, at or from the Voda Petroleum, Inc. State Superfund Site ("Site") that poses an imminent and substantial endangerment to the public health and safety or the environment pursuant to the Solid Waste Disposal Act, TEX. HEALTH & SAFETY CODE, Chapter 361 (the "Act"), and the ED's requested relief including issuance of a Commission order to require persons responsible for such solid wastes or hazardous substances to perform the Work, including conducting the Remedial Activities, as authorized by Sections 361.188 and 361.272 of the Act.

After proper notice, the TCEQ makes the following Findings of Fact and Conclusions of Law:

II.  Findings of Fact

A.  For purposes of this Administrative Order ("AO"), TCEQ has identified the following persons that are potentially responsible parties ("PRPs") for the solid waste and/or hazardous substances at the Site:

    AAMCO Transmissions

    A R Oil Co

    A T P Results Inc

**Exhibit A**

AT&T

Adena Exploration Inc

Allstate Transmissions

Amber Refining Inc

American Airlines Inc

American Auto

American Marazzi Tile Inc

American Norit Company Inc

American Spill Control Inc

Andrews Motor & Transmission

Anvil Shop

Aratex Services Inc

Archer Auto

Arco Oil and Gas Corporation

Ark-La-Tex Waste Oil Co Inc

Ashco Production Inc

Auto Precision Motors Inc

Autohaus

Aviation Properties Inc

Axelson Inc

Aycock Oil Corporation

B B Wells Waste Oil Inc

**Exhibit A**

1734

B E & K Inc

Basil Oil Field Service Inc

Baxter Oil Service

Bayou State Oil Corporation

Ben E Keith Company

Ben Griffin Tractor Company

Big Three Industrial Gas Inc

Billy D Cox Truck Leasing Inc

Bishops Auto

Blake Janet DBA D & D Radiator & Muffler

Borden Inc

Bright Truck Leasing Corporation

Brookhollow Exon Car Care

Brown & Root Inc

Brown Express Inc

Brunson Oil

Brushy Creek Saltwater Disposal Inc

Buck Resources Inc

Bule Diamond

Burland Enterprises Inc

CPL Industries

Cabot Corporation

**Exhibit A**

Can-Am Distributors and Warehouse Inc of Texas

Capacity of Texas Inc

Carraway Co

Carrier Air Conditioning

Cematco Inc

Central Power and Light Company

Central Texas Iron Works

Central Transfer & Storage Co

Champie Hill Mobil

Champion International Corporation

Channel Shipyard Company Inc

Chaparral Steel Company

Chief Oil & Chemical

Cities Service Company

Cities Service Pipe Line Company

City Motor Supply Inc

City of Dallas

City of Garland

City of Jefferson

City of Plano

City of University Park

Clarke Checks Inc

Clements Oil Corporation

Cliffs Automotive

Coker Automotive Center Inc

Collin County

Complete Auto Transit Inc

Continental Can Company USA Inc

Continental Car Wash

Continental Trailways Inc

Converter Shop Inc

Coors Distributor

Custom-Bilt Cabinet and Supply Inc

Custom-Crete Inc

Daljet Inc

Dallas Area Rapid Transit

Dallas Dressed Beef Company Inc

Dallas Lift Trucks Inc

Dallas Power & Light Company

Damson Gas Processing Corp

Davison Petroleum Products

Davison, T M

Delmar Disposal Co

Deloach Texaco

**Exhibit A**

Delta Distributors Inc

Diamond Shamrock

Dillingham & Smith Mechanical and Sheet Metal Contractors Inc

Dixie Oil

Donco Saltwater Disposal System

Double A & Y Corp

Dowell Schlumberger Incorporated

Dunlap-Swain

Durham Transportation Inc

E C Incorporated

East Texas Gas

Eastern ECC Company

Fina

The Firestone Tire and Rubber Company

First Interstate Bank of Dallas

Fort Sill

Fox & Jacobs

Franks Oil Service

Fred Jordan Inc

Fred Taylor GMC Truck Sales Inc

Freilich Howard DBA Quick Stop Brake & Muffler

Fruin-Colnon Corporation

**Exhibit A**

1738

G B Boots Smith Corporation

Gelco Truck Leasing Division Gelco Corporation

General Electric Company

General Telephone Company of the Southwest

General Tire Inc

General Truck Leasing Inc

Georgia-Pacific Corporation

Gifford-Hill Cement Company of Texas

Goff Willie

Grantham Oil Service

Greyhound Lines Inc

Grubbs Enterprises Ltd

Gulf States Oil & Refining Co

Gulf Stream Oil

H & H Oil Services

H & P Trans

Halliburton Energy Services Inc

Harris Bros Co

Harry Vowell Tank Trucks Inc

Hartsell Oil

Haynes Resources Inc

Hearne Ave Exxon

**Exhibit A**

Herod Oil Inc

Hertz Penske Truck Leasing Inc

The Highland Pump Company Inc

Holloway Welding & Piping Co

Hunt Oil Company

Hydraulic Service and Supply Company

Industrial Lubricants Co

Industrial Solvents Gulf Division of Industrial Solvents Corporation

Ingersoll-Rand Company

Inland Container Corporation

International Electric Corporation

International Paper Company

J & E Die Casting Co Division of Cascade Die Casting Group Inc

James T Gentry Inc

Janks Texaco

Jeffco

Jerrys Waste Oil

John Crawford Firestone Inc

Johnson Controls Inc

Jones Environmental Inc

Joy Manufacturing Company

Jubilee Oil Service

**Exhibit A**

1740

Juna Oil & Gas Co Inc

K & F Oil & Gas Management Inc

KRNN

Kayo Oil Company

Kellys Truck Terminal Inc

Kennys Mobil

Kosar Frank DBA Rite Way Truck Rental

LA Transit

L D Baker Inc DBA Baker Gulf Service

L & J Recovery Ltd

LTV Energy Products Company

Lake Country Trucking Inc

Lance Inc

Larry Gulledge Exxon

Las Colinas Service Center Inc

Lockheed Missiles & Space Company Inc

Lone Star Dodge Inc

Lone Star Logistics Inc

Long Mile Rubber Co

The Lubrizol Corporation

M Lipsitz & Co Inc

M & M Oil Salvage Inc

**Exhibit A**

MacMillan Bloedel Containers

Manvel Salt Water Disposal Company

Manville Sales Corporation

Marathon Battery Company

Martin-Decker

Mathews Trucking Company Inc

McAlister Construction Company

McBane Crude

McDonalds

Mega Lubricants Inc

Melton Truck Lines Inc

Metal Services Inc

Metro Aviation Inc

Metro Ford Truck Sales Inc

Millers Gulf

Minit Oil Change Inc

Mobil Oil Corporation

Modern Tire Service Inc

Mohawk Laboratories

Monsanto Company[1]

Moore James

---

[1] Only to the extent that Solutia Inc. is not excluded under applicable federal bankruptcy law.

**Exhibit A**

1742

Morgan Oil

Morgan, Troy L Jr

Mr Transmission

Murphy Brothers Service Center Inc

National Oilwell Inc

National Scientific Balloon Facility

National Supply Co

Naval Air Station Dallas

Navarro Petroleum Corp

Nobles Transmission

North Highland Mobil

Northwest Oil

Norwel Equipment Company

Nucor Corporation

Occidental Chemical Corporation

Oilwell Division of United States Steel Corporation

Olympic Fastening Systems Inc

On the Spot Oil Change

Owens Mobil

Oxendine, Von K DBA Oxendine Transmission

Oxy Cities Service NGL Inc

P N B Corporation

**Exhibit A**

1743

Pantera Crude Inc

Paramount Packaging Corporation Texas

Parawax

Parrott Oil Corp

Pauls Oils Service

Pearl Brewing Company

Pelican Energy of LA Inc

Pen Roy Oil of Odessa Inc

Pengo Industries Inc

Pennwalt Corporation

Pepsi Cola

Performance Friction Products Formerly Coltec Automotive Products
Division of Coltec Industries Inc

Peterbilt Motors Company

Petro Chem Environmental Services Inc

Petroleum Distributors Inc

Petroleum Market Products

Petroleum Refiners Unlimited Inc

Petroleum Stripping Inc

Pipes Equipment Co Inc

Pitts

Pool Company

Post Office Vehicle Maintenance Facility

**Exhibit A**

Presbyterian Hospital of Dallas

Prestige Ford

Preston Management Company

Preston Oil Service

Production Operators Inc

R & C Petroleum Inc

R & K Auto Repair Inc

Ralph Wilson Plastics

Rayco Oil Company

Reed Tool Company

Reeves Oil Co Inc

Repetro Inc

Retail Graphics Printing Company

Rhodes Oil

Richards-Gebaur AFB

Roadway Express Inc

Robison Cecil

Rock Tenn Converting Company

Rockwall

Rollins Leasing Corp

Royle Container

Ruan Leasing Company

**Exhibit A**

Ryder Truck Rental Inc

SETI

SKI Oil Incorporated

The Sabine Mining Company

Safeway

Santos Radiator

Schepps Dairy Inc

Schlumberger Well Services Division of Schlumberger Technology Corporation

Sears Roebuck and Co

Senco Marketing

Service Oil Co

Servion Inc

Shell Oil Company

Shippers Car Line Inc

Shore Company Inc

Shreveport Truck Center

Sitton Oil

Snappy Lube Inc

Snow Coil Inc

Sooner Refining Co Inc

South Coast Products Inc

Southeast Tex-Pack Express Inc

**Exhibit A**

1746

Southern Gulf

Southern Plastics Inc

Southland Sales Corporation

Southwest Disposal

Southwestern Bell Telephone Company

Southwestern Electric Power Company

Southwestern Petroleum Corporation

Specialty Oil

Sprague Electric Company

Star Solvents Inc

Steel City Crane Rental Inc

Stemco Inc

Steve D Thompson Trucking Inc

The Stroh Brewery Company

Sullivan Transfer & Storage

Summit White GMC Trucks Inc

Sun Engine Sales Inc

T E C Well Service Inc

Tan A Co

Tannehill Oil Products

Taylor Rental Center

Texaco Chemical Company

**Exhibit A**

Texas Gas Transmission Corporation

Texas Industrial Disposal Inc

Texas Industries Inc

Texas Mill Supply – Longview Inc

Texas State Technical Institute Airport

Texas Utilities Generating Company

Thompson Trans

Toneys Garage

Trailways Inc

Tricon

Trinity Industries Inc

Triple L Disposal

Tri-State Oil Tools Inc

Triton Aviation Services Inc

Truckstops of America

Tuneup Masters Inc of Texas

Twin City Transmission Service Inc

Union Oil 76 Truck Stop

United Gas Pipe Line Company

United Press International

United States Army Corps of Engineers Mat Sinking Unit

Vanguard Sales

Varo Inc

Vault Oil & Gas

Viking Freight Service Inc

Voda Petroleum Inc

Volvo White Truck Corporation

W F B Tank Bottom Reclaiming Corp

W W Waste Oil

Warren Petroleum Company

Westmoreland Joint Venture

Western Auto Supply Company

Westland Oil Company Inc

Willamette Industries Inc

Woodline Motor Freight

Woods Operating Co Inc

Wray Ford Inc

Yates SWD Corp

Young Chevrolet Inc

Zavala Energy Inc

and these parties

1.     are the owners or operators of the Site;

2.     owned or operated the Site at the time of processing, storage, or disposal of any solid waste;

**Exhibit A**

3. by contract, agreement, or otherwise, arranged to process, store, or dispose of, or arranged with a transporter for transport to process, store, or dispose of solid waste owned or possessed by the PRPs or by any other person or entity at the Site; or

4. accepted solid waste for transport to the Site as selected by the PRP.

B. Reserved.

C. The following PRPs entered into this AO as Agreeing Respondents but do not admit liability regarding the Site except for the purpose of enforcing this AO.

There are no Agreeing Respondents.

D. When ranked, the Site had a State Superfund Hazard Ranking System ("HRS") score of 23.6.

E. The portion of the Site used for ranking on the State Registry of Superfund Sites is described as follows:

All that certain lot, tract or parcel of land being situated in the David Ferguson Survey, Gregg County, Texas and being a part of a 6.12 acre tract of land conveyed from Chaco, Inc. to Ultra Oil, Inc. in deed recorded in Vol. 1212, Page 252, Deed Records, Gregg County, Texas and being more particularly described as follows:

BEGINNING at a 12" x 12" fence corner post on the north ROW of Duncan Road, said point being the SE corner of a 50 acre tract conveyed from Charles McBride to Chaco, Inc. in deed recorded in Vol. 1206, Page 83, Deed Records, Gregg County, Texas and also being the SE corner of the herein described tract;

THENCE along the SBL of the above mentioned 6.12 acre tract, also being the north ROW of Duncan Road:

N 89 deg. 47' 06" W, a distance of 199.02 feet;

S 63 deg. 18' 26" W, a distance of 57.72 feet;

S 89 deg. 55' 54" W, a distance of 120.65 feet to a ½" iron rod for this most southerly SW corner, same being N 89 deg. 55' 54" E, 200.00 feet from the SW corner of said 6.12 acre tract;

THENCE N 00 deg. 56' 53" W, a distance of 200.00 feet to a ½" iron rod for corner;

**Exhibit A**

1750

THENCE S 89 deg. 14' 07" W, a distance of 200.00 feet to a ½" iron rod for this most northerly SW corner, same being located on the east ROW of Charise Drive and the WBL of said 6.12 acre tract and being N 00 deg. 56' 53" W, 200.00 feet from the SW corner of same:

THENCE N 00 deg. 56' 56" W, along the east ROW of said Charise Drive, a distance of 271.25 feet to a 5/8" iron rod for this NW corner, same being the NW corner of said 6.12 acre tract;

THENCE N 89 deg. 03' E, along the NBL of said 6.12 acre tract, a distance of 578.45 feet to a 5/8" iron rod for this NE corner, same being the NE corner of said 6.12 acre tract;

THENCE S 00 deg. 04' 55" E along the EBL of said 6.12 acre tract, a distance of 452.78 feet to the Place of BEGINNING of the herein described tract and containing 5.201 acres.

The remainder, a contiguous 0.92 acre tract of land, is described as follows:

All that certain lot, tract or parcel of land being situated in the David Ferguson Survey, Gregg County, Texas and being a part of a 6.12 acre tract of land conveyed from Chaco, Inc., to Ultra Oil, Inc., in deed recorded in Vol. 1212, page 252, Deed Records, Gregg County, Texas, and being more particularly described as follows:

BEGINNING at a 5/8" iron rod set in the EBL of Charise Drive; THENCE North with the EBL of Charise Drive 200 feet to a ½" iron rod; THENCE North 89 deg. 14' 07" E, 200 feet to ½" iron rod for corner, THENCE S 00 deg. 56' 53" E, a distance of 200 feet to ½" iron rod for corner: THENCE S 89 deg. 55' 54" W with the said SBL of said 6.12 acre tract, 200 feet to the point of BEGINNING, containing [*sic*] 1 acre of land, more or less, together with all improvements situated thereon.

F.    The Site consists of the area listed in Paragraph E above. In addition, the Site includes any areas outside the area listed in Paragraph E above where as a result, either directly or indirectly, of a release of solid waste or hazardous substances from the area described in Paragraph E above, solid waste or hazardous substances have been deposited, stored, disposed of, or placed or have otherwise come to be located.

G.    The Site was proposed for listing on the State Registry of Superfund Sites in the *Texas Register* on November 17, 2000. 25 Tex. Reg. 11594-95 (Nov. 17, 2000).

H.    The Site historically has been used as a waste oil recycling facility.

I.  The Chemicals of Concern at the Site include those substances listed in Exhibit B. The substances listed in Exhibit B have been processed, deposited, stored, disposed of, or placed or have otherwise come to be located on the Site.

J.  The substances listed in Exhibit B have been documented in surface and subsurface soil and groundwater at the Site.

K.  The substances listed in Exhibit B are:

1.  substances designated under Section 311(b)(2)(A) of the Federal Water Pollution Control Act, as amended (33 United States Code ("U.S.C.") Section 1321);

2.  elements, compounds, mixtures, solutions, or substances designated under Section 102 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") (42 U.S.C. Section 9601 et seq., as amended);

3.  hazardous wastes having the characteristics identified under or listed under Section 3001 of the Federal Solid Waste Disposal Act, as amended (42 U.S.C. Section 6921), excluding wastes, the regulation of which has been suspended by Act of Congress;

4.  toxic pollutants listed under Section 307(a) of the Federal Water Pollution Control Act (33 U.S.C. Section 1317);

5.  hazardous air pollutants listed under Section 112 of the Federal Clean Air Act, as amended (42 U.S.C. Section 7412); or

6.  any imminently hazardous chemical substances or mixtures with respect to which the administrator of the Environmental Protection Agency ("EPA") has taken action under Section 7 of the Toxic Substances Control Act (15 U.S.C. Section 2606).

L.  The substances listed in Exhibit B include the following: garbage; rubbish; refuse; sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility; or other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations and from community and institutional activities, or hazardous substances, for the purposes of TEX. HEALTH & SAFETY CODE Sections 361.271 through 361.277 and 361.343 through 361.345.

M.  The substances listed in Exhibit B are solid wastes or hazardous substances.

N.  Solid wastes or hazardous substances at the Site listed in Exhibit B are, or potentially are, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment.

O.  Potential pathways for human exposure to the solid wastes or hazardous substances listed in Exhibit B include incidental ingestion of, inhalation of or dermal exposure to surface and/or subsurface soil, and ingestion of or dermal exposure to groundwater.

P.  Exposure to levels of dichloroethylene, cis-1,2-; benzene; propylbenzene, n-; MTBE (methyl tertiary-butyl ether); tetrachloroethylene; toluene; trichloroethane, 1,1,1-; trichloroethylene; trimethylbenzene, 1,2,4-; trimethylbenzene, 1,3,5-; vinyl chloride; xylene, m-; xylene, o-; xylene, p-; dichloroethylene 1,1-; and dichloroethane, 1,2- found at the Site poses an unacceptable carcinogenic risk or an unacceptable toxicity risk.

Q.  The solid wastes or hazardous substances at the Site are not capable of being managed separately under the remedial action plan.

R.  On November 6, 2000, the Commission provided written notice of the proposed listing of the Site on the State Registry to each PRP identified as of that date at the PRP's last known address.

S.  On September 12, 2008, the Commission provided written notice of the public meeting and of the opportunity to comment on the proposed Remedy as specified in Sections 361.187(b) and (c) of the Act to each PRP identified as of that date at the PRP's last known address.

T.  On September 12, 2008, each PRP identified as of that date was provided an opportunity to fully fund or perform the proposed Remedial Activities, as specified in Sections 361.187(d) and 361.133(c) of the Act.

U.  No voluntary actions have been undertaken at the Site by any PRPs.

V.  The Remedy Selection Document ("RSD") for the Site is attached to this AO as Exhibit A.

W.  The remedy adopted in Exhibit A is selected as the Remedy to be implemented in accordance with this AO.

III.  Conclusions of Law and Determinations

A.  The PRPs listed in Section II (Findings of Fact) Paragraph A are responsible parties ("RPs") pursuant to Section 361.271 of the Act.

B.      Some of the substances referenced in Section II (Findings of Fact) Paragraph I, which are found at the Site, are hazardous substances as defined in Section 361.003(11) of the Act.

C.      Some of the substances referenced in Section II (Findings of Fact) Paragraph I, which are found at the Site, are solid wastes as defined in Section 361.003(34) of the Act.

D.      Hazardous substances were deposited, stored, disposed of, or placed or otherwise came to be located at the Site; and solid wastes were stored, processed, disposed of, or discarded at the Site.

E.      The Site is a facility as defined in Section 361.181(c) of the Act.

F.      The Site is a solid waste facility as defined in Section 361.003(36) of the Act.

G.      "Imminent and substantial endangerment" is defined by rule as follows: A danger is imminent if, given the entire circumstances surrounding each case, exposure of persons or the environment to hazardous substances is more likely than not to occur in the absence of preventive action. A danger is substantial if, given the current state of scientific knowledge, the harm to public health and safety or the environment which would result from exposure could cause adverse environmental or health effects. 30 TEX. ADMIN. CODE Section 335.342(9).

H.      There has been a release (as defined in Section 361.003(28) of the Act) or threatened release of hazardous substances or solid wastes into the environment at the Site that poses an imminent and substantial endangerment (as defined in 30 TEX. ADMIN. CODE Section 335.342(9)) to the public health and safety or the environment; and therefore, the Site will be listed on the State Registry of Superfund Sites as per Section V (Order) Paragraph A.

I.      The release or threatened release of hazardous substances or solid wastes into the environment at or from the Site has not been proven to be divisible pursuant to Section 361.276 of the Act.

J.      The actions required by this AO are reasonable and necessary to protect the public health and safety or the environment.

K.      The Site is ineligible for listing on the National Priorities List ("NPL") because the HRS score was below 28.5.

L.      Funds from the Federal Government are unavailable for the Remedial Activities at this Site because it is ineligible for the NPL.

**Exhibit A**

1754

IV.   Exhibits and Definitions

A.   The following exhibits are incorporated by reference into this AO:

"Exhibit A"   Remedy Selection Document

"Exhibit B"   List of Solid Wastes and Hazardous Substances at the Site

"Exhibit C"   Field Sampling Plan Contents Outline

B.   The following terms have the meaning set out below:

| | |
|---|---|
| "Agreeing Respondent" | The PRPs listed in Section II (Findings of Fact) Paragraph C that fund or perform the Work and have agreed to the terms and conditions of this AO as evidenced by signing a consent form. |
| "Chemicals of Concern" | Any chemical that has the potential to adversely affect ecological or human receptors due to its concentration, distribution, and mode of toxicity. |
| "Day" | A calendar day. |
| "Defaulting Performing Party" | Any Performing Party that fails to comply with the terms or conditions of this AO. |
| "Demobilization" | The dismantling and removal of all construction equipment from the Site. |
| "Effective Date" | The Day ten (10) Days after the issue date of this AO. |
| "Executive Director (ED)" | The Executive Director of the TCEQ or a designee. |
| "include" | Use of the term include, in all its forms, in this AO is intended to express an enlargement or illustrative application specifying a particular thing already included within the preceding general words. It is not used as a term of limitation. |
| "Institutional Control" | A legal instrument which indicates the limitations on or the conditions governing use of the property which ensures protection of human health and the environment in accordance with 30 TEX. ADMIN. CODE Chapter 350 and as required by the Remedy. |
| "Parties" | Collectively, the Respondents and the Commission. |

Page 23 - Voda Petroleum, Inc., State Superfund Site

**Exhibit A**

| "Performing Parties" | Collectively, the Agreeing Respondents and persons that did not enter into this AO but that fund or perform the Work. |
|---|---|
| "Post Construction Activities (PCA)" | All Remedial Activities at the Site, subsequent to issuance of the Approval of RA Completion, required to complete the Remedial Activities in accordance with this AO. |
| "Post Construction Cost Estimate" | An estimate of the cost to perform all of the PCA for as long as post construction activities are needed. |
| "Project Manager" | The individual designated by the ED to oversee implementation of the Work and to coordinate communications with the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties. |
| "Remedial Action (RA)" | Those Remedial Activities, except for Post Construction Activities, undertaken at the Site, including on-site physical construction and any required institutional controls, to implement the Remedy. The areal extent of the RA is not limited to the Site. It includes all suitable areas in proximity to the Site necessary for implementation of the Remedial Activities. |
| "Remedial Activities" | The RD, RA, PCA, and any other actions required to implement and maintain the Remedy pursuant to the RSD and 30 TEX. ADMIN. CODE Chapter 335, Subchapter K and 30 TEX. ADMIN. CODE Chapter 350. |
| "Remedial Activities Contractors" | The individual, company, or companies retained by the Agreeing Respondents, or if there are no Agreeing Respondents to this AO, by the Performing Parties to undertake any or all phases of the Remedial Activities. Remedial Activities Contractors cannot assume the role of any quality assurance official required by this AO. |
| "Remedial Design (RD)" | Those Remedial Activities during which engineering plans and technical specifications are developed for the Remedy. |

**Exhibit A**

1756

| | |
|---|---|
| "Remediation Goals" | Cleanup standards or other measures of achievement of the goals of the Remedy, consistent with the Act, 30 TEX. ADMIN. CODE Chapter 335, Subchapter K and 30 TEX. ADMIN. CODE Chapter 350, determined by ED to be necessary at the Site to achieve and to maintain the Remedy. |
| "Remedy" | The Remedy adopted for the Site in the Remedy Selection Document to clean up or control exposure at the Site in accordance with all applicable laws and regulations and to be implemented in accordance with this AO. The Remedy includes all applicable requirements contained in the Act, 30 TEX. ADMIN. CODE Chapter 335, Subchapter K and 30 TEX. ADMIN. CODE Chapter 350. |
| "Remedy Selection Document (RSD)" | The document that was developed for the Site, based on Site specific information, that specifies the Remedy, and that was adopted by the ED and TCEQ after the opportunity for public review and comment. |
| "Responsible Parties" | The PRPs listed in Section II (Findings of Fact) Paragraph A. |
| "Respondents" | Collectively, the Agreeing Respondents, the RPs, and the Performing Parties. |
| "Samples" | Samples of environmental media taken pursuant to and in accordance with this AO. |
| "Sections" | Those major divisions of this AO designated by Roman numerals. |
| "Site Coordinator" | The individual designated by the Agreeing Respondents, or if there are no Agreeing Respondents to this AO, the Performing Parties to oversee the Remedial Activities Contractors and the implementation of the Remedial Activities and to coordinate communications with the ED. |
| "Site Representative" | A person designated by the Project Manager that is authorized to oversee the Remedial Activities. |

**Exhibit A**

| "Substantial Completion" | The point, as determined by the ED in his sole discretion, at which the Work (or a specified part thereof) has been substantially completed in accordance with any work plans or documents required to be developed pursuant to this AO. |
|---|---|
| "Work" | All activities to be undertaken or performed in accordance with and as required by this AO. |

V.  Order

Therefore, the TCEQ orders:

A.  The Site will be listed on the State Registry of Superfund Sites.

B.  Reserved.

C.  Respondents shall reimburse the Hazardous and Solid Waste Remediation Fee Account for all of the ED's costs of the Remedial Investigation ("RI") and the Feasibility Study ("FS"), including the oversight costs of these activities. Respondents shall reimburse the Hazardous and Solid Waste Fee Account for all uncompensated Pre-Remedial Investigation costs, including oversight costs of these activities.

The RPs and any Defaulting Performing Parties shall reimburse the Hazardous and Solid Waste Remediation Fee Account for all costs incurred by the ED in implementing and in overseeing the Work and for any costs incurred by the ED for activities other than the RI and FS to the extent that such costs have not been paid.

Reimbursement is to be made within forty-five (45) Days after the ED transmits a Demand Letter stating the amount owed. Payment is to be paid by cashiers check or money order. All payments and accompanying letters or documentation should contain the following information: "Voda Petroleum, Inc. State Superfund Site," "Cost Recovery Funds for the Hazardous and Solid Waste Remediation Fee Account (Fund 550) of the State of Texas," "PCA Code 50482," "Docket Number 2009-1706-SPF," and "TCEQ Project Manager, Carol Boucher, P.G." All payments and accompanying letters or documentation should be mailed to: Cashier's Office, MC-214, TCEQ, Re: Voda Petroleum, Inc. State Superfund Site, P.O. Box 13088, Austin, TX 78711-3088. All checks and money orders shall be payable to the "Texas Commission on Environmental Quality," or "TCEQ." The requirement to make such payments will survive the termination of this AO in accordance with Section XXXIII (Termination of the Administrative Order).

D.     This AO applies to and is binding upon Respondents, their agents, successors, and assigns. Respondents are jointly and severally responsible for carrying out the Work. Performance of any or all of the Work by the Performing Parties or Agreeing Respondents shall not excuse any other Respondent from such performance. Upon performance by any Respondent of Remedial Activities, either alone or in conjunction with other Performing Parties, such Respondent shall, from such performance forward, become a Performing Party. Such performance by a Respondent of some of the Remedial Activities does not excuse the Respondent from performance of those Remedial Activities that took place prior to the Respondent becoming a Performing Party or any other preexisting requirement of this AO. No change in the ownership or corporate status and no acquisition of a Respondent will alter its respective responsibilities under this AO.

E.     Respondents that own or lease real property at the Site shall provide a copy of this AO to all of their lessees or sublessees of the Site until such time as this AO is terminated in accordance with Section XXXIII (Termination of the Administrative Order) and to any prospective owners or successors before all or substantially all property rights, stock, or assets are transferred.

F.     Respondents shall provide a copy of this AO to all contractors, subcontractors, laboratories, and consultants retained by Respondents to perform any or all of the Work within thirty (30) Days after the Effective Date or on the date such services are retained, whichever date occurs later. Notwithstanding the terms of any contract, Respondents remain responsible for compliance with this AO and for ensuring that their contractors and agents comply with this AO.

G.     Within forty-five (45) Days after the Effective Date each Respondent that owns real property at the Site shall record a copy or copies of this AO, with all exhibits, in the appropriate office where land ownership and transfer records are filed or recorded, and shall ensure that the recording of this AO is properly indexed to each and every property comprising any part or all of the Site so as to provide notice to third parties of the issuance and terms of this AO with respect to those properties. Each Respondent that owns real property comprising all or any part of the Site shall, within sixty (60) Days after the Effective Date, send notice of such recording and indexing to the ED. The obligations and restrictions of this AO run with the land and are binding upon any and all persons who acquire any interest in any real property comprising all or any part of the Site.

Not later than ninety (90) Days before any transfer of any property interest in any property included within the Site and in accordance with Section XII (Notices and Submittals) Respondents that own or lease such real property shall submit the transfer documents to the ED.

**Exhibit A**

H. In accordance with Section 361.1855 of the Act and for the purpose of selecting the Remedy, the ED has selected commercial/industrial as the appropriate land use for the Site. Any change in use of any or all of the Site must comply with Section 361.190 of the Act.

I. A qualified Remedial Activities Contractor shall direct and supervise all aspects of the Remedial Activities. Within ten (10) Days after the Effective Date each Respondent that is not an Agreeing Respondent shall notify the ED of its intent to perform the Work.

In addition to fulfilling the requirements of Section VIII (Project Manager/Site Coordinator) Paragraph C, within ten (10) Days after the Effective Date, Agreeing Respondents or, if there are no Agreeing Respondents, Performing Parties shall notify the ED in writing of the name, title, qualifications, relevant licenses, and permits of the Site Coordinator and Remedial Activities Contractor proposed to be used in carrying out the Remedial Activities. The Agreeing Respondents shall demonstrate or, if there are no Agreeing Respondents, the Performing Parties shall demonstrate that each proposed Remedial Activities Contractor has any licenses necessary to do business in the State of Texas and permits necessary to perform any or all of the Remedial Activities. If at any time the Agreeing Respondents or, if there are no Agreeing Respondents, Performing Parties propose to use a different Remedial Activities Contractor, the Agreeing Respondents or Performing Parties, as appropriate, shall notify the ED before the new Remedial Activities Contractor performs any of the Remedial Activities. The Agreeing Respondents' Site Coordinator shall be the Project Manager's and Site Representative's point of contact for all Performing Parties. All Performing Parties must coordinate with and cooperate with any Agreeing Respondents in the performance of any and all of the Work.

J. The Remedy may be modified as specified in 30 TEX. ADMIN. CODE Section 335.349. Except as specified in the previous sentence and in Section XVIII (Extension of Deadlines), the terms of this AO may be amended upon approval by the Commission after notice to all Respondents.

K. Respondents shall provide all the necessary information and assistance for TCEQ's Community Relations personnel to implement the Community Relations Plan.

L. All ED-approved final submittals, documents, plans, and reports required to be developed and approved by the ED pursuant to this AO will be incorporated in and enforceable under this AO.

M. In complying with this AO, Respondents shall at all times comply with the requirements of the Act and 30 TEX. ADMIN. CODE Chapter 335, Subchapter K and 30 TEX. ADMIN. CODE Chapter 350, as applicable.

**Exhibit A**

1760

VI.     Remedial Activities

A.      The Respondents shall undertake the Remedial Activities in the following phases:

Remedial Design ("RD");

Remedial Action ("RA"); and

Post Construction Activity ("PCA").

The ED may, in his sole discretion, waive, in writing, a requirement to submit any report, submittal, document or plan otherwise required to be submitted by this AO.

B.      Remedial Design

1.      Not later than ten (10) Days after the Effective Date, Respondents shall submit a Design Concept Memorandum ("DCM") to the ED for review, comment, and approval. Respondents must submit a DCM that includes:

a.      Description of key performance and design criteria for the Remedy necessary to meet the requirements of the Remedy Selection Document;

b.      Identification of all significant design options that may be considered by the design professional to meet the required performance and design criteria and the proposed option(s) to meet those criteria; and,

c.      Identification of potential problems and unresolved issues which may affect the timely completion of the RD, RA and PCA, and proposed solutions to those problems.

2.      Within thirty (30) Days after the ED approves the DCM, Respondents shall:

a.      Obtain written landowner consent for any institutional control to be placed on the land records for any or all of the Site as required by this AO or by TCEQ rule and submit a copy of the consent to the ED; and

b.      Submit a Preliminary RD to the ED for review, comment, and approval.

3.      The Respondents shall submit a Preliminary RD that meets the requirements as set forth in this Section and consists of a 30% completion of all sections of the following RD submittals:

RA Schedule;

RA Field Sampling Plan ("RA FSP");

Remedial Action Construction Quality Assurance Project Plan ("RA C-QAPP");

RA Plans and Specifications;

RA Health and Safety Plan ("RA HASP"); and

Post Construction Activity Plan ("PCA Plan").

4. The RA Schedule will describe the sequence, dependency on other activities, and duration of each activity to be conducted during the RA including Project Milestones (which will be subject to the provisions of Section XXI (Stipulated Penalties), Paragraph D) and the specific mobilization date to begin the RA.

5. The RA Sampling and Analysis Plan (RA SAP) and RA C-QAPP will describe the means of assuring quality during the RA and will specify a quality assurance official ("Respondent QA Official"), independent of the RA Contractors, to conduct a quality assurance program during the RA.

   a. The RA SAP will be comprised of the RA FSP and the "Texas Commission on Environmental Quality Superfund Cleanup Section, Remediation Division, Quality Assurance Project Plan for the Superfund Program" (Program QAPP) which is most current as of the Effective Date of this AO. The RA SAP will address sampling and analysis relating to environmental parameters which may present toxic risk to human health or the environment. Respondents and their contractors and subcontractors, including analytical laboratories, shall strictly adhere to all requirements of the approved RA SAP.

   b. The Program QAPP text will not be altered. Alterations to the Program QAPP necessitated by project specific circumstances will be effected by appropriate notation in Section 8.0 "Exceptions, Additions and Changes to the Program QAPP" of the RA FSP.

   c. The RA FSP will include:

      i) All data required by the Program QAPP and the contents outline attached as Exhibit C to this AO;

ii)    Data Quality Objectives ("DQO's") which provide for the collection and analysis of a sufficient quantity and quality of data to demonstrate attainment of the Remediation Goals and to demonstrate protection of off-site receptors from exposure to Chemicals of Concern during the RA; DQO's will be developed in accordance with EPA "Guidance for the Data Quality Objectives Process, EPA QA/G-4"; and

iii)    A perimeter air monitoring plan including the action levels necessary to protect off-site receptors from exposure to the Chemicals of Concern; the Chemicals of Concern to be sampled; the kinds of sampling techniques to be used to sample; the number, type, and location of monitors; the calibration methods and schedule; and the sampling and reporting frequency.

d.    In regard to laboratories and laboratory analytical work, Respondents shall:

i)    Ensure that all contracts with laboratories utilized by Respondents for analysis of Samples provide for access to those laboratories by the ED's personnel and the ED's authorized representatives to assure the accuracy of laboratory results related to the Site.

ii)    Ensure that each laboratory it may use is qualified to conduct the proposed work. This includes use of methods and analytical protocols for the Chemicals of Concern in the media of interest within detection and quantitation limits consistent with both QA/QC procedures and approved DQOs for the site. The Respondent QA Official shall provide written certification that it has reviewed the laboratory's Quality Assurance Plan and capabilities and has determined that:

(a)    The laboratory has a documented quality assurance program in place that is generally consistent with National Environmental Laboratory Accreditation Conference (NELAC) standards;

(b)    The laboratory has demonstrated and documented proficiency with each sample preparation and determinative combination to be used on the project;

(c)     The laboratory has documented standard operating procedures for each of the methods required for the project; and,

(d)     The laboratory has the capability of meeting the analytical objectives for the project.

A table which presents the laboratory's method detection limits and quantitation limits and the preliminary remediation goal for each analyte of concern, and a table that presents the laboratory's control limits for quality control parameters, i.e., surrogates, matrix spike/matrix spike duplicate samples, and laboratory control samples must be submitted along with the certification letter and must be submitted attached or inserted into the RA FSP.

iii)     Ensure that all laboratories used for analysis of Samples are acceptable to the ED. A laboratory may be deemed unacceptable for any of the following reasons:

(a)     repeated or numerous deficiencies found in the laboratory quality assurance program during the ED's or EPA's laboratory inspections;

(b)     repeated or numerous deficiencies in laboratory performance;

(c)     debarment by EPA; or

(d)     failure to comply with any requirement or criteria of the Program QAPP or this AO.

iv)     Ensure that all data submitted to the agency is produced by laboratories accredited by TCEQ according to 30 TEX. ADMIN. CODE Chapter 25 (relating to Environmental Testing Laboratory Accreditation and Certification) Subchapters A and B.

6.     The RA C-QAPP will describe the activities necessary to ensure that the Remedy is constructed to meet or exceed all design criteria, plans, specifications, and all applicable Remediation Goals. The RA C-QAPP will address sampling and analysis relating to physical properties of constructed engineered controls which must meet specified criteria to ensure the long-term performance of those features (e.g. physical soil properties of soil

backfill or constructed clay caps, physical properties of geotextiles and liner materials, leak testing of piping systems and containment vessels, etc.). At a minimum, the RA C-QAPP will include the following elements:

a. The responsibility and authority of organizations and key personnel involved in designing and constructing the RA;

b. The qualifications of the Respondent QA Official(s) and supporting inspection personnel;

c. The observations and tests that will be used to ensure that the construction meets or exceeds all design criteria, plans and specifications and all applicable Remediation Goals;

d. The sampling activities, sample size, methods for determining locations, frequency of sampling, acceptance and rejection criteria, and methods for ensuring that corrective measures are implemented; and

e. Detailed reporting requirements.

7. The RA Plans and Specifications will establish the sequences, procedures and requirements to be implemented at the Site including at a minimum:

a. Demolition activities including monitor well closure, decontamination, environmental controls, and disposal.

b. Excavation activities including: establishment of limits of initial excavation for surface and subsurface soils with provisions for field controls; excavation materials handling including stockpiling; excavation confirmation sampling; backfill procedures; air emissions control; stormwater management; cross-contamination prevention; and equipment and personnel decontamination procedures and facilities.

c. Estimated quantities of material to be excavated and estimated quantities of materials to be disposed of off-site.

d. Site restoration activities, including backfill materials, compaction, and final cover.

e. Plans including at a minimum:

i) Site plan;

**Exhibit A**

ii)   Demolition plan;

iii)  Excavation plan, plan view;

iv)   Excavation plan, sections;

v)    Monitor well construction details;

vi)   Final Site grading plan;

vii)  Construction details; and

viii) All other plans and specifications necessary to describe sequences, procedures, and requirements to conduct the Remedial Activities in a manner protective of human health and the environment.

8.   The RA HASP will specify the procedures that are sufficient to protect on-site personnel and the public from the physical, chemical and/or biological hazards of the site. The HASP will address all requirements of 29 CFR Chapter XVII - "Occupational Safety and Health Administration (OSHA), Department of Labor," 40 C.F.R. § 35.6015(a)(21) "Health and Safety Plan," and all applicable safety regulations, ordinances and statutes pertaining to the safety of on-site personnel and the public. The HASP and any revisions or addenda will be reviewed and signed by a Board Certified Industrial Hygienist.

The TCEQ relies on the Respondent in the preparation of an adequate HASP. However, TCEQ reserves the right to review and provide comments on the Respondent's HASP. If TCEQ provides comments, they constitute only general safety guidelines which are not intended to cause the Respondent to reduce the level of protection. Any language in the comments or in this AO which appears to give the TCEQ the right to direct or control the Respondent's means, methods and details of the Work shall be deemed to mean that the Respondent will follow TCEQ's desires only as to the results of the Work. The Respondent is solely responsible for preparing an adequate HASP, for complying with the RD and the applicable safety laws and regulations, for performing the Work in a safe manner and for protecting the health and safety of on-site personnel and the public. The Respondent shall address the TCEQ's comments and concerns and if necessary submit a revised HASP. TCEQ notation of "approval," "acceptance," or similar language in response to a HASP submittal for review shall not alter the responsibilities of the parties as described in this Section. In the event that TCEQ notes a HASP "approved" or "accepted" or uses similar language to

indicate that there are no further comments, such notation shall be deemed to mean only:

*We have reviewed your HASP under the AO provision reserving the right for TCEQ to review and provide comments constituting general safety guidelines (not intended to cause the Respondent to reduce the level of protection). The reviewer(s) might not be Board Certified Industrial Hygienist or any other type of safety professional. We have no comments (or further comments) at this time on your HASP. We recognize this HASP as your final HASP. If you change this HASP you must submit a revision or addendum for review and potential comment in accordance with this AO.*

***Do not rely on TCEQ review or comments (or lack thereof) on your HASP for any purposes.***

*By telling you we have no comments (or further comments) we are not assuming responsibility for your means, methods, details or sequences, nor are we assuming any duty of protection to you, your employees, your subcontractors or suppliers, or their employees, or to any third party. Any language in the comments or in this AO which appears to give the TCEQ the right to direct or control your means, methods and details of the Work shall be deemed to mean that you will follow TCEQ's desires only as to the results of the Work. You are solely responsible for preparing and implementing an adequate HASP, for complying with the RD and the applicable safety regulations, ordinances and statutes, for performing the Work in a safe manner and for protecting the health and safety of on-site personnel and the public.*

9.   The PCA Plan will describe all sequences, procedures and requirements for implementing the PCA. The PCA Plan will, at a minimum, include the following:

   a.   A Post Construction Sampling and Analysis Plan ("PC SAP") and Post Construction Quality Assurance Project Plan ("PC-QAPP") meeting the criteria established herein for the RA SAP and RA C-QAPP but addressing all sampling and analyses relating to PCA;

   b.   Post Construction Plans and Specifications necessary to assure that the Remedial Activities attain and maintain the Remediation Goals;

   c.   A PCA Schedule describing the sequence, dependency on other activities, and duration of each activity to be conducted during the PCA including Project Milestones (which will be subject to Section

XXI Stipulated Penalties Paragraph D), and the specific mobilization date to begin the PCA;

d.   A Post Construction Cost Estimate providing an estimate for a qualified third party to perform all of the tasks necessary for post construction for as long as PCA are needed, in accordance with the PCA Schedule; and

e.   A Post Construction Activities HASP ("PCA HASP") which meets all of the requirements specified above for the RA HASP but which is appropriate to protect on-site personnel and the public from any physical, chemical and/or biological hazards of the site relating to the Post Closure period and activities.

10.   Within thirty (30) Days after the ED provides written comments to the Site Coordinator on the Preliminary RD, Respondents shall submit a Pre-Final RD to the ED for review, comment, and approval. The Pre-Final RD will consist of 95% RD submittals. Respondents shall address the ED's comments on the Preliminary RD and submit a summary note which clearly and explicitly indicates how each comment by the ED on the Preliminary RD has been satisfactorily addressed and which will also identify all other revisions or changes from the Preliminary RD.

11.   Within twenty (20) Days after the ED provides the Site Coordinator with the ED's written comments on the Pre-Final RD, Respondents shall submit the Final RD, prepared and sealed by a Professional Engineer registered in the State of Texas, to the ED. The Final RD will consist of 100% complete RD submittals except the PCA Plan. A Professional Engineer shall include a certification that the design was prepared to attain all Remediation Goals upon implementation. Respondents shall address the ED's comments on the Pre-Final RD and submit a summary note which clearly and explicitly indicates how each of the ED's comments on the Pre-Final RD has been satisfactorily addressed and which will also identify all other revisions or changes from the Pre-Final RD.

12.   The ED will notify the Site Coordinator of his approval or disapproval of the Final RD including written comments. Within fifteen (15) Days after the ED provides written comments to the Site Coordinator, Respondents shall resubmit the Final RD, in both clean and redline, strikeout format, with a summary note which clearly and explicitly indicates how each of the ED's comments on the previous draft of the Final RD has been satisfactorily addressed and which will also discuss all other revisions or changes from the previous draft of the Final RD.

13. The ED will notify the Site Coordinator of his approval or disapproval of each resubmittal of the Final RD. Each resubmittal will be submitted as specified in Paragraph 12 above. Disapproval of the first resubmittal, and each subsequent resubmittal, is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

14. Upon the ED's approval, the documents comprising the Final RD will be incorporated as requirements into and will be enforceable under this AO.

C. Remedial Action

1. Respondents and Respondents' contractors and subcontractors shall not mobilize to the Site until the Final RD is approved by the TCEQ. Under no circumstance will mobilization occur prior to TCEQ approval of the RA HASP.[2] The Respondents will be responsible for initiating, maintaining, and supervising all safety precautions and programs required for the protection of all persons who may be affected by the Work, the Work, and any property which maybe affected by the Work.

2. As soon as practicable after the award of any contract to ship solid wastes and/or hazardous substances from the Site and prior to any such actual shipment, Respondents shall submit to the Project Manager a written certification containing all relevant information regarding such shipments. The certification will include:

a. The name and location of the facility to which the solid wastes and/or hazardous substances are to be shipped;

b. The type and quantity of the solid wastes and/or hazardous substances to be shipped;

c. The expected schedule for the shipment of the solid wastes and/or hazardous substances; and

d. The method of transportation and the name, address, and phone number of the transporter.

3. In addition, Respondents shall certify that:

a. No enforcement order is currently imposed on any selected receiving facility or transporter by any regulating authorities;

---

[2]TCEQ's "approval" or "acceptance" of the HASP will be given the meaning as explained in Section VI (Remedial Activities) Paragraph B.8.

b. The selected receiving facility and transporter are permitted to accept the specific solid wastes and/or hazardous substances to be shipped from the Site by all appropriate regulating authorities; and

c. After appropriate inquiry, they have no knowledge that either the selected receiving facility or transporter is non-compliant with any federal, state, or local requirement.

4. The ED may inspect the Remedial Activities and/or the Site at any time to evaluate compliance with this AO.

5. At least ten (10) Days prior to the expected date of achieving Substantial Completion of the RA, the Site Coordinator shall conduct a pre-Substantial Completion inspection and shall develop and submit to the ED a preliminary punch list identifying any nonconformance with the requirements of the RA Plans and Specifications.

6. At the same time that the Performing Parties submit the Substantial Completion punch list, they shall schedule a Substantial Completion inspection by the ED. The Site Coordinator shall accompany the ED during the Substantial Completion inspection.

7. Within 10 Days after the ED's on-site inspection, the Respondents shall submit to the ED in writing a revised punch list incorporating any deficiencies identified by the ED during the Substantial Completion inspection, indicating those deficiencies that are completely addressed and providing a proposed schedule and list of activities necessary to complete the RA. The ED will notify the Site Coordinator in writing of his approval or disapproval of the revised punch list.

If the ED disapproves the revised punch list, the ED will provide written comments to the Site Coordinator. Within ten (10) Days after the ED provides written comments to the Site Coordinator on the revised punch list, Respondents shall submit a final punch list, in both clean and redline, strikeout format, with a summary note that clearly and explicitly indicates how each of the ED's comments on the revised punch list has been satisfactorily addressed. The ED will notify the Site Coordinator of his approval or disapproval of the final punch list with comments. If disapproved by the ED, within fifteen (15) Days after the ED provides written comments, Respondents shall resubmit the final punch list. The ED will notify the Site Coordinator of his approval or disapproval of each resubmittal of the final punch list. Disapproval of the first resubmittal and each subsequent resubmittal is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

8. When Respondents believe that they have completed the RA, they shall submit a certification to the ED that the RA is complete. If the ED identifies RA items to be corrected or completed, Respondents shall immediately correct or complete these items.

9. Within forty five (45) Days after Respondents certify that the RA is complete, Respondents shall submit to the ED a draft RA Report, containing the following:

   a. A certification from a Professional Engineer licensed in the State of Texas that the RA has been completed in compliance with the Final RD and this AO and that the RA is complete;

   b. All data collected during the RA and documentation of compliance with the terms of the RA Quality Assurance Project Plan and the RA Construction Quality Assurance Plan;

   c. Copies of waste manifests for all Class II, Class I, and hazardous wastes and substances disposed of off-site;

   d. As-built drawings showing:

      i) Areas and depths of excavation, with verification sample results by grid area;

      ii) Final site plan with topographic contours;

   e. Progress photographs;

   f. Proposed areas for soil and groundwater that will require land use restrictions and/or other deed notices, certifications, or restrictions; and,

   g. Proposed language for any institutional controls in accordance with and as required by this AO and TCEQ rules.

10. The ED will notify the Site Coordinator of his approval or disapproval of the draft RA Report. If the ED disapproves the draft RA Report, the ED will provide written comments to the Site Coordinator.

11. Within fifteen (15) Days after the ED provides written comments to the Site Coordinator on the draft RA Report, Respondents shall submit a final RA Report, in both clean and redline, strikeout format, with a summary note which clearly and explicitly indicates how each of the ED's comments on the

draft RA Report has been satisfactorily addressed and which also discusses all other revisions or changes from the draft RA Report.

12. The ED will notify the Site Coordinator of his approval or disapproval of the final RA Report with comments.

13. If disapproved by the ED, within fifteen (15) Days after the ED provides written comments, Respondents shall resubmit the RA Report as specified in Paragraph 11 above. Each resubmittal will also be submitted in accordance with Paragraph 11 above.

14. The ED will notify the Site Coordinator of his approval or disapproval of each resubmittal of the final RA Report including written comments. Disapproval of the first resubmittal and each subsequent resubmittal is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

15. Within thirty (30) Days after approval of the final RA Report and after obtaining the required written landowner consent in accordance with Paragraph B.2 of this Section, Respondents shall:

   a. record a copy or copies of any required institutional controls in compliance with the requirements found in 30 TEX. ADMIN. CODE Chapter 350.111 in the appropriate local or county office where land ownership and transfer records are filed or recorded;

   b. ensure that the recording of these documents is properly indexed and recorded to each and every property at the Site in the appropriate office where land ownership and transfer records are filed so as to provide notice to third parties concerning those properties; and

   c. send evidence of such recording, landowner consent, and indexing to the ED.

16. After he approves the final RA Report, receives evidence of the filing of any institutional control from each property owner or other person as required by Section V (Order) Paragraph G, and determines that the financial assurance requirements of Paragraph E below have been satisfied, the ED will issue an Approval of RA Completion to the Agreeing Respondents, or if there are no Agreeing Respondents to this AO, any Performing Parties.

**Exhibit A**

D.  Post Construction Activity

1.  Concurrent with the submittal of the preliminary punch list for the Substantial Completion inspection, the Site Coordinator shall 1) submit a list of the name, title, qualifications, relevant licenses and permits of the Remedial Activities Contractors proposed to be used in carrying out any or all of the PCA and 2) submit to the ED a Revised PCA Plan.

2.  The ED will notify the Site Coordinator of his approval or disapproval of the Revised PCA Plan including written comments to the Site Coordinator.

3.  Within fifteen (15) Days after the ED provides written comments to the Site Coordinator, Respondents shall submit the Final PCA Plan, in both clean and redline, strikeout format, with a summary note which clearly and explicitly indicates how each of the ED's comments on the Revised PCA Plan has been satisfactorily addressed and which will also discuss all other revisions or changes from the Revised PCA Plan.

4.  The ED will notify the Site Coordinator of his approval or disapproval of the submittal and each resubmittal of the Final PCA Plan. Each resubmittal will be submitted as specified in Paragraph 3 above. Disapproval of the first resubmittal and each subsequent resubmittal is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

5.  Upon the ED's approval of the final PCA Plan, Respondents shall begin the PCA in accordance with the schedule included in the PCA Plan.

6.  The Agreeing Respondent(s) shall submit a Five Year Review report to the TCEQ for TCEQ's approval no later than five (5) years after the ED approves the Final Remedial Action for the Site. The Five Year Review report must be conducted in accordance with the U.S. Environmental Protection Agency's "Comprehensive Five-Year Review Guidance." The Agreeing Respondent(s) shall submit Five Year Review reports for the Site to the TCEQ every five (5) years unless and until the TCEQ approves cessation.

E.  Post Construction Financial Assurance

1.  Respondents shall provide financial assurance in the minimum amount of the final Post Construction Cost Estimate and shall maintain such financial assurance for the full duration of the PCA. Within ten (10) Days of the ED's approval of the PCA Plan, Respondents shall submit a written proposal for providing financial assurance to the ED for approval.

2.	Subject to the ED's approval, financial assurance may be demonstrated by one or a combination of the following mechanisms: letter of credit, surety bond guaranteeing payment, surety bond guaranteeing performance, fully funded trust, insurance, escrow account or other approved mechanism. Each financial assurance document will be issued by an institution with the authority to issue the document whose operations are regulated and examined by a federal or state agency.

3.	Within fifteen (15) Days after the ED provides written approval of Respondents' proposed financial assurance mechanism to the Site Coordinator, Respondents shall submit the necessary financial assurance documents to the ED. The ED will notify the Site Coordinator of his approval or disapproval of the financial assurance documents with comments. If disapproved by the ED, within fifteen (15) Days after the ED provides written comments to the Site Coordinator, Respondents shall resubmit the financial assurance documents, in both clean and redline, strikeout format, with a summary note which clearly and explicitly indicates how each of the ED's comments on the previous draft of the financial assurance documents has been satisfactorily addressed and which will also discuss all other revisions or changes from the previous draft of the financial assurance documents.

4.	The ED will notify the Site Coordinator of his approval or disapproval, with comments, of each resubmittal of the financial assurance documents. Each resubmittal will be submitted in accordance with Paragraph 3 above. Disapproval of the first resubmittal and each subsequent resubmittal is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

VII.	Failure to Attain Remediation Goals or Findings of Significant Difference

A.	If at any point in the Remedial Activities the Performing Parties conclude that the Remedial Activities as implemented in accordance with this AO will not attain the Remediation Goals, or if the Performing Parties find that conditions at the Site differ from those that form the basis of the RSD and significantly change the scope, performance or costs of the Remedial Activities, then the Performing Parties shall take the actions specified in this Section.

B.	Within ten (10) Days after the Performing Parties initially determine that a failure to attain Remediation Goals or that a significant difference in the scope, performance or cost of the Remedial Activities as described in this Section exists, Performing Parties shall notify the ED of that determination with a description of its basis.

C.   Not later than sixty (60) Days after the initial assertion of a failure to attain Remediation Goals or of a significant difference in the scope, performance or cost of the Remedial Activities, the Performing Parties shall submit a Failure Evaluation Report to the ED for his approval.

D.   The Performing Parties shall submit a Failure Evaluation Report that meets the requirements of this Section. The Failure Evaluation Report will include a discussion of the following: the data related to the failure to attain Remediation Goals or to the assertion of a significant difference, conclusions concerning all such data, and any known cause of the failure to attain Remediation Goals or of the significant difference, and a recommendation for any necessary additional studies. Data presented in the Failure Evaluation Report will comply with the DQOs.

E.   The ED will not consider the failure of a design element or remedial action that is not required by this AO to be the basis for a failure to attain the Remediation Goals.

F.   The ED will consider differences in the quantity or extent of contaminants as the basis for a determination of a significant difference only when such differences are so significant as to cause the Remedy not to be the lowest cost alternative that is technologically feasible and reliable and that effectively mitigates and minimizes damage to and provides adequate protection of the public health and safety or the environment.

G.   After receipt of the Failure Evaluation Report, the ED will notify the Site Coordinator of his approval or disapproval of the report with comments. If the ED determines that the basis of the Performing Parties' assertion of a failure to attain Remediation Goals or of a significant difference is valid, no applicable stipulated penalties will be imposed for missed deadlines subsequent to the Performing Parties' notification made in accordance with Paragraph B above, except for failure to submit documents pursuant to this Section. If the ED determines that the basis of a failure to attain Remediation Goals or of an assertion of a significant difference is not valid, the ED will direct that Remedial Activities continue and that the Performing Parties pay any applicable stipulated penalties for any missed deadlines.

H.   Unless the ED approves the Failure Evaluation Report and/or directs continuation of Remedial Activities, within thirty (30) Days after the ED provides written comments to the Site Coordinator, the Performing Parties shall resubmit the Failure Evaluation Report, in both clean and redline, strikeout format, with a summary note which clearly and explicitly indicates how each of the ED's comments on the previous draft of the Failure Evaluation Report has been satisfactorily addressed and which will also identify all other revisions or changes from the previous version of the Failure Evaluation Report.

**Exhibit A**

I.  The ED will notify the Site Coordinator of his approval or disapproval, with comments, of each resubmittal of the Failure Evaluation Report. Each resubmittal will be submitted in accordance with Paragraph H above. Disapproval of the first resubmittal and each subsequent resubmittal is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

J.  Not later than ninety (90) Days after a determination by the ED that the Remedy will not attain the Remediation Goals or a significant difference exists, the Respondents shall submit to the ED for approval a written report evaluating alternatives to the Remedial Activities and may submit a proposal for such alternative Remedial Activities as may be necessary to achieve the Remediation Goals. Any proposed alternatives must comply with the remedy selection criteria contained in 30 TEX. ADMIN CODE Chapter 335, Subchapter K and 30 TEX. ADMIN. CODE Chapter 350. The Remedy may be modified, as stated in Section V (Order) Paragraph J, only as specified in 30 TEX. ADMIN. CODE Section 335.349.

K.  In the event TCEQ determines that alternate or additional remedial actions are necessary because of the Remedy's failure, TCEQ may terminate this AO.

VIII.  Project Manager/Site Coordinator

A.  Not later than the Effective Date, the ED will designate a Project Manager to oversee implementation of the Work and to coordinate communication between the ED and the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties.

B.  Respondents shall direct all communications regarding the Remedial Activities, whether written or oral, at a minimum, to the Project Manager or, if not available, the alternate Project Manager.

C.  In addition to fulfilling the requirements of Section V (Order) Paragraph I, within ten (10) Days after the Effective Date, the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties shall submit a written notice to the Project Manager containing the Site Coordinator's address, phone number and/or pager number at which he/she may be contacted at any time in case of emergency. The Site Coordinator shall notify the ED in writing at least seven (7) Days prior to the start date of any field activities associated with the Remedial Activities. All Performing Parties must coordinate with and cooperate with any Agreeing Respondents in the performance of any and all of the Work.

D.  The Project Manager has the authority to require that the Remedial Activities are performed in accordance with all applicable statutes and regulations and with this AO and to require a cessation of the performance of any part or all of the Remedial Activities that:

**Exhibit A**

1.  In the Project Manager's opinion, may present or contribute to an imminent and substantial endangerment to public health, welfare, or the environment because of an actual or threatened release of solid wastes or hazardous substances from the Site; or

2.  In the Project Manager's opinion, is not in conformance with any work plan developed in accordance with this AO; or

3.  In the Project Manager's opinion, is a violation of any work plan developed in accordance with this AO, HASP, or RA Quality Assurance Project Plan.

E.  Within 24 hours after the Project Manager issues an oral order to halt any or all of the Remedial Activities, if time permits, the Project Manager will provide a brief explanation of the basis for the order. As soon as possible, but in any event no more than fourteen (14) Days after the initial order to halt any or all of the Remedial Activities, the Project Manager will provide a written explanation of the basis for the order to halt any or all of the Remedial Activities to the Site Coordinator. The Remedial Activities may be resumed only after the basis for the order to halt any or all of the Remedial Activities has been corrected and instructions to proceed have been provided to the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties by the Project Manager. All additional costs associated with the cessation of any or all of the Remedial Activities will be borne by Respondents.

F.  During the RD and RA, the Project Manager and Site Coordinator shall hold meetings at least once per month to review the progress and details of the Remedial Activities and to review and resolve any discrepancies in data. At the ED's discretion, these meetings may be held by telephone. At least seven (7) Days prior to each meeting, the Performing Parties shall deliver an agenda for the meeting and any documents to be discussed to the Project Manager.

G.  The ED and the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties may change their respective Project Manager, Alternate Project Manager, or Site Coordinator by written notice to each other of the name, address, and telephone number of the new Project Manager, Alternate Project Manager, or Site Coordinator seven (7) Days prior to the change, or if seven (7) Days notice is not feasible, as soon as possible.

H.  The Project Manager may assign other persons, including other TCEQ employees or contractors, to serve as a Site Representative and may temporarily delegate her or his responsibilities to such Site Representative. The Project Manager will notify the Site Coordinator orally or in writing of such delegation.

IX.    Endangerment and Immediate Threat

A.    In the event of any action or occurrence during the performance of the Remedial Activities which causes or threatens a release of a solid waste or hazardous substance or which may present an immediate threat to public health or welfare or the environment, Respondents shall immediately take all appropriate action to prevent, abate, or minimize such release or threat and shall immediately notify the Project Manager and Site Representative or, if the Project Manager cannot be contacted, the alternate Project Manager and Site Representative. Respondents shall also notify the TCEQ Emergency Response Unit, 1-800-832-8224, Region 5, Tyler. Respondents shall take such action in accordance with all applicable provisions of the HASP. If Respondents fail to take appropriate response action as required by this Section and the ED takes such action instead, Respondents shall reimburse the ED all costs of the response action. Respondents shall make payments of such costs as specified in Section V (Order) Paragraph C and not later than forty-five (45) Days after the ED transmits a Demand Letter stating the amount owed.

B.    Nothing in the preceding paragraph will be deemed to limit any authority of the State of Texas to take, direct, or order all appropriate action to protect human health and the environment or to prevent, abate, or minimize an actual or threatened release of solid wastes or hazardous substances to the environment on, at, or from the Site.

X.    Submittals Requiring the ED's Approval

A.    Upon the ED's approval of a submittal, Respondents shall proceed to implement all actions required by the submittal according to the schedule approved by the ED.

B.    Approved submittals may be modified upon agreement by the ED and the Performing Parties. The Performing Parties shall submit proposed modifications and obtain approval in accordance with the process for submittals specified in this AO generally. Upon approval of any modification, the modification is incorporated into the original submittal for all purposes.

C.    The ED's approval of submittals or modifications is administrative in nature and allows the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties to proceed to the next steps in the Remedial Activities. The ED's approval does not imply any warranty of performance, does not imply that the Remedy, when constructed, will meet the Remediation Goals, nor does it imply that the Remedy will function properly and ultimately be accepted by the ED.

XI.    Submittal of Documents, Sampling, and Analyses

A.    Respondents shall provide to the ED all data, information, documents, or records related to the Site which are generated or obtained by any Respondent within twenty

(20) Days of any written request from the ED for such data, information, document, or record. Respondents shall provide written notice to the ED immediately upon generating or obtaining any such data, information, document or record.

B.    Subject to the confidentiality provisions set forth in Paragraph C below, all data, information, documents, and records developed pursuant to this AO or submitted by Respondents to the ED pursuant to this AO will be available to the public.

C.    Respondents may assert a claim of business confidentiality pursuant to the Texas Public Information Act as to any process, method, technique, or any description thereof that the Respondents claim constitutes proprietary or trade secret information developed by Respondents or developed by their contractors or subcontractors. If no confidentiality claim accompanies the process, method, technique, or description thereof when submitted to the ED, any such process, method, technique, or description thereof may be made available to the public by the ED or the State of Texas without further notice to Respondents. Respondents shall make business confidentiality determinations in good faith.

D.    The ED or his Site Representatives may take splits or duplicates of any samples obtained by any Respondent at the Site at any time including during the implementation of the Remedial Activities. The Respondents shall provide assistance necessary for the ED to take split or duplicate samples.

E.    Respondents shall provide the ED with a schedule of routine sampling and notify the ED at least seven (7) Days before any non-routine sampling is conducted at the Site, except in the event of situations provided for by Section IX (Endangerment and Immediate Threat). Respondents shall collect and analyze all Samples in accordance with approved work plans developed pursuant to this AO and shall handle all Samples in accordance with the approved RA Quality Assurance Project Plan.

F.    Respondents shall submit all data, information, reports, schedules, and other documents required by this AO in hard copy format (two hard copies of draft submittals and three of final submittals) and in specific computer software format (one electronic copy of each draft and final submittal) as determined by the Project Manager.

XII.   Notices and Submittals

Respondents shall make all notices and submittals required by this AO in writing and in accordance with the contact information contained in this Section unless otherwise expressly authorized. Receipt by the Site Coordinator of any notice or communication from the ED relating to this AO will be deemed by the ED to be receipt by all Respondents. All information required to be submitted pursuant to this AO, including data, documents, records, reports, approvals, and other correspondence, will be submitted to the following

**Exhibit A**

Parties at the addressees listed below or to such other addressees as such Party hereafter may designate in a written communication to all other Parties:

*As to the Texas Commission on Environmental Quality:*

*For mail:*

> Texas Commission on Environmental Quality
> Remediation Division
> Mail Code 136
> P.O. Box 13087
> Austin, TX 78711-3087
> Attention: Project Manager/Voda Petroleum, Inc. State Superfund Site

*For overnight express mail or delivery service:*

> Project Manager
> Mail Code 136
> Voda Petroleum, Inc. State Superfund Site
> TCEQ, Remediation Division
> Building D, Floor 1, Room 277N
> 12100 Park 35 Circle
> Austin, TX 78753

*By facsimile:*

> Project Manager
> Voda Petroleum, Inc. State Superfund Site
> Superfund Cleanup Section
> (512) 239-2450

XIII.  Periodic Review

A.  Respondents shall provide written progress reports on the Remedial Activities to the ED, as specified below in Paragraphs B and C.

B.  RD/RA Progress Reports

1.  Respondents shall submit written monthly progress reports to the ED beginning on the tenth Day of the month following the Effective Date. These progress reports will describe the actions taken pursuant to this AO during the previous month, including a general description of activities and progress during the reporting period, activities projected to be commenced or completed during the next reporting period, and any problems encountered

**Exhibit A**

1780

or anticipated by Performing Parties in commencing or completing the Remedial Activities. Progress reports will include all data received during the reporting period and an up-to-date progress schedule. Progress reports will identify any violations of this AO and calculate any applicable stipulated penalty required under Section XXI (Stipulated Penalties). The requirement to submit these monthly progress reports will be terminated at the earlier of: 1) if no PCA Plan is required, when the AO is terminated in accordance with Section XXXIII (Termination of the Administrative Order) or 2) if a PCA Plan is required, upon the ED's approval of a Final PCA Plan in accordance with Section VI (Remedial Activities) Paragraph D.

2. If an RD/RA progress report submitted by Performing Parties is deficient, the ED will provide written notice to the Site Coordinator. The notice will include comments and a description of the deficiencies.

3. Within ten (10) Days of the ED providing the Site Coordinator with a notice of deficiency of an RD/RA progress report, Performing Parties shall make such changes as the ED deems necessary and resubmit the progress report to the ED.

C. Post Construction Progress Reports

1. Performing Parties shall submit written monthly post construction progress reports to the ED beginning on the tenth Day of the month following the initiation of the PCA as described in Section VI (Remedial Activities) Paragraph D.1. These progress reports will describe the actions taken pursuant to this AO, including a general description of activities and progress during the reporting period, activities projected to be commenced or completed during the next reporting period, and any problems encountered or anticipated by Performing Parties in commencing or completing the Remedial Activities. Post construction progress reports will include all data received during the reporting period and an up-to-date progress schedule. Post construction progress reports will identify any violations of this AO and calculate any applicable stipulated penalty required under Section XXI (Stipulated Penalties). The requirement to submit monthly post construction progress reports will be terminated when the conditions specified in Section XIV (Termination of Post Construction Activities) have been met as determined by the ED in his sole discretion.

2. If a monthly post construction progress report submitted by Performing Parties is deficient, the ED will provide written notice to the Site Coordinator. This notice will include comments and a description of the deficiencies.

3.  Not later than ten (10) Days after the ED provides the Site Coordinator with a notice of deficiency of a post construction progress report, Performing Parties shall make such changes as the ED deems necessary and resubmit the post construction progress report to the ED.

## XIV. Termination of Post Construction Activities

The ED will terminate the requirement to perform PCA if Respondents demonstrate that all Remediation Goals have been met. The Respondents shall satisfactorily perform PCA for the duration of time specified in the RSD, and the Remediation Goals will not be deemed achieved before the time specified in the RSD.

## XV. Records

A.  Each Respondent shall preserve and retain, and shall instruct its accountants, attorneys, employees, agents, contractors, and subcontractors and anyone else acting on its behalf at the Site to preserve and retain, in the form of originals or copies, all data, records, documents, and information of whatever kind, nature, or description that relate in any way to the Site that are now or that come to be in its possession or control. The previous sentence is meant to include data, records, documents, or information relating to each Respondent's potential liability or to any other person's potential liability for the Site under Section 361.271 of the Act.

B.  All data, records, documents, and information required to be preserved and retained in accordance with Paragraph A above will be preserved and retained for a minimum of ten (10) years after the ED's issuance of the Approval of RA Completion. At the end of this ten (10) years, each Respondent shall notify the ED at least ninety (90) Days before any such data, records, documents, or information is destroyed. If the ED requests, Respondents shall, at no cost to TCEQ, provide the ED originals or copies of such data, records, documents, or information which are not protected by a privilege as per Paragraph C below.

Until this AO is terminated in accordance with Section XXXIII (Termination of the Administrative Order), Respondents shall maintain an index of documents that Respondents claim contain privileged information. The index will contain, for each document, the date, author, addressee, and subject of the document. Respondents shall submit a copy of the index to the ED within ten (10) Days after the ED submits a written request.

C.  Any Respondent refusing to provide copies of any data, information, records, or documents based upon a claim of privilege shall identify the data, information, record, or document and explain the basis for the claim. Notwithstanding the immediately preceding sentence, any data, record, information, or document required to be developed or submitted pursuant to this AO will be available to the public.

Page 50 - Voda Petroleum, Inc., State Superfund Site

**Exhibit A**

D.	At any time prior to the completion of the Work, the ED may contact the Site Coordinator to determine the location and/or to obtain copies of any or all of the data, records, documents, or information developed in accordance with this AO. The Respondents shall provide copies of any such data, records, documents, and information to the ED at no cost to TCEQ.

E.	Upon request by the ED, Respondents shall submit to the ED all data, information, records, and documents requested, including those relevant to the items specified in Section 361.182(b) of the Act for possible inclusion in the administrative record in accordance with 30 TEX. ADMIN. CODE Section 335.345.

XVI.	Access

A.	As of the Effective Date, any Respondent that owns, in whole or in part, the Site, an off-site area that is to be used for access to the Site, property subject to or affected by the Remedial Activities, or other property where documents generated in accordance with this AO are or come to be located shall provide access to such property to the ED; any federal, state or local authorities and their contractors approved by the ED; and the Performing Parties and their authorized representatives and contractors. Failure to provide such access may result in the imposition of statutory and/or stipulated penalties. Respondents shall indemnify TCEQ, and TCEQ will not be liable, for any loss or claim arising out of Respondents' activities at the Site, on off-site areas to be used for access to the Site, on property subject to or affected by the Remedial Activities, and on other property where documents generated in accordance with this AO are or come to be located.

B.	If a person other than a Respondent owns, in whole or in part, the Site, an off-site area that is to be used for access to the Site, property subject to or affected by the Remedial Activities, or other property where documents generated in accordance with this AO are or come to be located, Respondents shall obtain, or use their best efforts to obtain, Site access agreements from the then current owner(s) within ninety (90) Days of the Effective Date. Respondents shall secure agreements to provide access for the ED, federal, state or local authorities and their contractors as approved by the ED, and the Performing Parties and their authorized representatives and contractors. Respondents shall insure that such agreements specify that TCEQ is not liable for any loss or claim arising out of any activities at the Site, on off-site areas to be used for access to the Site, on property subject to or affected by the Remedial Activities, or on other property where documents generated in accordance with this AO are or come to be located. Respondents shall provide copies of such agreements to the ED before the Performing Parties initiate field activities. Respondents' best efforts shall include, if necessary, providing reasonable compensation to any property owner not a Party. If access agreements are not obtained within the ninety (90) Days, Respondents shall immediately notify the ED of their failure to obtain access. If the ED determines, in his sole discretion, that the Performing Parties have used best

efforts to obtain such access, the ED will, pursuant to statutory authority, make appropriate efforts to obtain such access upon reasonable terms to the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, to the Performing Parties. Any revision to the deadlines specified in this AO necessitated by Respondents' inability to obtain such access may be considered a reasonable ground for extending any affected deadline pursuant to Section XVIII (Extension of Deadlines).

C.      Subject to the Agreeing Respondents' reasonable safety and internal security requirements, the ED will have the authority to enter, freely move about, and exit the Site, any off-site area that is to be used for access to the Site, property subject to or affected by the Remedial Activities, or other property where documents generated in accordance with this AO are located or come to be located, for the purposes of: inspecting conditions at the Site, the Remedial Activities and all information, documents, data, records, operating logs, and contracts related to the Site; reviewing the Performing Parties' progress in performing the Remedial Activities; conducting such tests as the ED deems necessary; using a camera, sound recording device, or other documentary type equipment; verifying the data submitted to the ED by the Performing Parties; and performing any Remedial Activities not being performed or not being satisfactorily performed by the Performing Parties. Nothing herein will be interpreted as limiting or affecting the ED's right of entry or inspection authority under state or federal law. All persons with access to the Site shall comply with the HASP.

XVII.   Delay in Performance

Respondents shall notify the ED of any delay or anticipated delay in achieving compliance with any requirement of this AO. Such notification will be made by telephone to the Project Manager or, if not available, the alternate Project Manager, within forty-eight (48) hours after Respondents first knew or should have known that an event might cause a delay. Within seven (7) Days after notifying the ED by telephone, Respondents shall provide written notification fully describing the cause of the delay, the anticipated duration of the delay, the measures taken and to be taken by Respondents, their contractors, or consultants, to prevent or minimize the delay, and the timetable by which these measures have been, are being, and will be implemented. A revised timetable will be implemented upon its approval by the ED.

XVIII.  Extension of Deadlines

Upon failure to comply with the terms and conditions of this AO, any Defaulting Performing Parties shall cease to be Performing Parties and all such rights and privileges as accrue to the Performing Parties pursuant to this AO will immediately terminate as to such Defaulting Performing Parties. At that time all responsibilities and obligations that attach to RPs in addition to those that attach to Performing Parties will attach to Defaulting Performing

Parties that are RPs, including the requirement to pay TCEQ costs in accordance with Section V (Order) Paragraph C.

Notwithstanding anything to the contrary in this AO, the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties shall bear no costs for any fines, penalties, or increases in the ED's oversight of the Remedial Activities resulting from Defaulting Performing Parties actions or inactions. Defaulting Performing Parties and the RPs may be assessed the ED's full costs for oversight of the Work. If actions required by this AO are delayed or are not timely completed because of acts or omissions of one or more Defaulting Performing Parties, the Agreeing Respondents, or if there are no Agreeing Respondents to this AO, the Performing Parties may request a time extension. Upon such request, the ED will approve the time extension, disapprove it, or approve such alternative time extension as the ED in his sole discretion deems appropriate. Thereafter, Respondents shall adhere to all remaining deadlines in this AO and in any documents developed in accordance with this AO and approved by the ED.

The Agreeing Respondents may seek and the ED may grant an extension of any deadline contained in this AO or in any document submitted pursuant to this AO. Agreeing Respondents shall submit the request for a deadline extension no later than seven (7) Days prior to the deadline date and shall substantiate good cause for extension of the deadline. The determination of what constitutes good cause and the length of any deadline extension will be at the ED's sole discretion.

XIX.    Reserved

XX.    Compliance with Applicable Laws

A.    Respondents shall perform all actions pursuant to this AO in accordance with the requirements of all applicable or relevant and appropriate federal, state, and local laws, including the Texas Solid Waste Disposal Act as codified in the Texas Health and Safety Code and the Texas Oil and Hazardous Substance Spill Prevention and Control Act as codified in the Texas Water Code. This AO is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

B.    All materials removed from the Site shall be disposed of or treated at a facility which is in compliance with all applicable or relevant and appropriate federal, state, and local laws and shall be disposed of or treated in accordance with all such requirements.

XXI.    Stipulated Penalties

A.    Subject to the provisions of Sections XXII (Force Majeure) and XXIII (Resolution of Disagreements), noncompliance with this AO shall result in the imposition of stipulated penalties as set forth below.

B.  Penalties Related to Timeliness of Submittals Required by this AO

For failure to:

1.  meet the deadlines set forth in Sections V (Order) and VI (Remedial Activities);

2.  submit timely reports as set forth herein;

3.  submit data in a timely fashion or provide timely notice of sampling as required by Section XI (Submittal of Documents, Sampling, and Analyses); or

4.  resubmit a document within the timeframes specified herein;

    Agreeing Respondents shall pay stipulated penalties in the following amounts for each Day and part thereof during which any delay listed in Subparagraphs B.1 through B.4 above continues:

    | *Period of Delay* | *Amount/Day* |
    |---|---|
    | 1st through 14th Day | $500.00 |
    | 15th through 45th Day | $2,000.00 |
    | 46th Day and beyond | $3,000.00 |

C.  Penalties Related to Competency of Submittals

This Paragraph applies to submittals of any document required by Sections VI (Remedial Activities), VII (Failure to Attain Remediation Goals or Findings of Significant Difference), and XIII (Periodic Review) which fail to be responsive and acceptable. Agreeing Respondents shall pay a stipulated penalty of $5,000 for each week and part thereof that an acceptable and responsive document is not submitted. This penalty may be assessed in addition to any penalties assessed under Paragraph B of this Section.

D.  Penalties Related to Project Milestones

For failure to:

1.  achieve any RA Project Milestones in accordance with the schedule approved under Section VI (Remedial Activities) Paragraph B; or

2.　　achieve any PCA Project Milestones in accordance with the schedule approved under Section VI (Remedial Activities) Paragraph B.

Agreeing Respondents shall pay stipulated penalties in the following amounts for each Day and part thereof during which any delay listed in Subparagraphs D.1 through D.2 above continues:

| Period of Delay | Amount/Day |
|---|---|
| 1st through 14th Day | $1,000.00 |
| 15th through 45th Day | $3,000.00 |
| 46th Day and beyond | $10,000.00 |

E.　　For disobeying an order to halt any or all of the Remedial Activities under Section VIII (Project Manager/Site Coordinator), Agreeing Respondents shall pay stipulated penalties of $10,000 per Day.

F.　　For failure to use best efforts to obtain Site access in accordance with Section XVI (Access), Agreeing Respondents shall pay a stipulated penalty of $1,000 per Day.

G.　　For denying access provided for in Section XVI (Access), Agreeing Respondents shall pay stipulated penalties of $10,000 per Day.

H.　　Any Agreeing Respondent who fails to provide records within ten (10) Days after receipt of a written request from the ED or within such other period as specified herein shall pay a stipulated penalty of $10,000 per Day.

I.　　With the exception of the stipulated penalties referenced in Paragraphs E, G and H above which attach to individual Agreeing Respondents, all stipulated penalties assessed in accordance with this Section are joint and several, not individual, obligations.

J.　　Agreeing Respondents shall pay stipulated penalties assessed under this Section as specified in Paragraph K below within sixty (60) Days after ED transmits a demand letter stating that stipulated penalties have accrued or after resolution of a disagreement as specified in Section XXIII (Resolution of Disagreements), whichever comes later. Stipulated penalties will accrue from the date of noncompliance until the noncompliance is corrected, provided however, that if any Respondent prevails in resolution of disagreements as specified in Section XXIII (Resolution of Disagreements), it shall have no liability to pay stipulated penalties with regard to those matters submitted for resolution of disagreements in accordance with Section XXIII (Resolution of Disagreements) in which it prevails.

**Exhibit A**

K.      Agreeing Respondents shall pay stipulated penalties to "General Revenue Fund of the State of Texas" and shall mail payments to:

Chief Fiscal Officer (MC 180)
Texas Commission on Environmental Quality
"Re: Voda Petroleum, Inc. State Superfund Site Administrative Order, Docket Number 2009-1706-SPF"
P.O. Box 13088
Austin, Texas 78711-3088

L.      The requirement to pay stipulated penalties that have been incurred prior to the termination of this AO in accordance with Section XXXIII (Termination of the Administrative Order) will survive termination of this AO.

M.      A single act or omission may be the basis for more than one type of stipulated penalty. A single act or omission may also be subject to more than one (1) Day of stipulated penalties. In cases where more than one stipulated penalty applies to a single act or omission, the ED may choose which stipulated penalties to assess.

N.      The ED has the sole discretion to reduce or waive stipulated penalties and to do so as to specific Agreeing Respondents or groups of Agreeing Respondents.

O.      Stipulated penalties against Agreeing Respondents will be in lieu of administrative and civil penalties for the same violation but will not prevent TCEQ from seeking enforcement of the ordering provisions by injunctive relief. Respondents that are not Agreeing Respondents are subject to administrative and civil penalties.

## XXII. Force Majeure

A.      If a delay in performance is caused (in whole or in part) by events beyond the reasonable control of the Agreeing Respondents, that failure will not be construed as a violation of this AO. The burden of establishing that an event is beyond their reasonable control lies with the Agreeing Respondents. The Agreeing Respondents shall notify the ED in writing within seven (7) Days of the start of the Force Majeure event and within seven (7) Days of the end of the Force Majeure event. Agreeing Respondents shall submit the notification as specified in this Section. Failure to so notify the ED will constitute a waiver of the claim of Force Majeure.

Such notice will describe in detail the cause of the delay; the anticipated duration of the delay; the measures taken and to be taken by the Agreeing Respondents, their contractors or consultants, to prevent or minimize the delay; and the timetable by which these measures have been, are being, and will be implemented. Measures to prevent or minimize the delay will be implemented upon the ED's written approval of the timetable. The Agreeing Respondents shall also submit, for the ED's approval,

**Exhibit A**

a proposed schedule for subsequent Remedial Activities whose deadlines have been affected by the Force Majeure event. Neither the ED's approval of the timetable of measures to be taken to prevent or minimize delays or of the revised schedule of Remedial Activities will be construed as excusing the delay or as a waiver of TCEQ's rights to enforce this AO.

B. Force Majeure events will not include increased costs or expenses of any part or all of the Work or the financial inability of any Agreeing Respondent to perform any part or all of the Work.

C. If the ED and the Agreeing Respondents cannot agree that the cause for the delay was a Force Majeure event or cannot agree upon the schedule for subsequent Remedial Activities, then the disagreement will be resolved according to Section XXIII (Resolution of Disagreements). The Agreeing Respondents shall have the burden of demonstrating that Force Majeure is warranted.

## XXIII. Resolution of Disagreements

A. The Agreeing Respondents and the ED shall attempt to resolve on an informal basis any issues arising under Sections V (Order) through XXXIII (Termination of the Administrative Order) on which there is disagreement. The Agreeing Respondents shall commence informal negotiations by notifying the Project Manager in writing that there is a disagreement and that this Section is being invoked. Except as provided below in Paragraph D, informal negotiations will not extend beyond thirty (30) Days from the date the Project Manager receives such notification, unless the Agreeing Respondents and the ED agree otherwise in writing.

B. The Agreeing Respondents shall notify the Project Manager within thirty (30) Days after the Day the Agreeing Respondents knew or should have known of the events giving rise to the disagreement. Should the Agreeing Respondents fail to give such notice, the ED's decision on any disagreement will be binding.

C. Notification of the Project Manager in accordance with Paragraph A above will not by itself postpone the deadlines established in accordance with this AO or stay the accrual of any applicable stipulated penalties for the matter at issue. However, the obligation to pay any applicable stipulated penalties to the TCEQ will be stayed pending resolution of the disagreement in accordance with this Section.

D. If the ED makes a determination to perform a portion or all of the Remedial Activities, the Agreeing Respondents shall have five (5) Days after notification to the Site Coordinator to commence informal negotiations by notifying the Project Manager in accordance with Paragraph A above. Informal negotiations will not extend beyond fifteen (15) Days from the date the ED receives notification, unless the Agreeing Respondents and the ED agree otherwise in writing.

E.   The procedure for any resolution of disagreements subsequent to informal negotiations will be found in Sections 361.321 and/or 361.322 of the Act.

F.   Unless otherwise specifically set forth herein, the fact that resolution of disagreements is not specifically set forth in individual Sections is not intended to and will not bar the Agreeing Respondents from invoking this Section as to any disagreement arising under Sections V (Order) through XXXIII (Termination of the Administrative Order), including any disagreement concerning the ED's exercise of discretion under the terms of this AO.

## XXIV. Indemnification

Respondents agree to indemnify and hold harmless TCEQ and its officers, employees, agents, principals and assigns from and against all fines, penalties, claims, damages, losses, demands, judgments, settlements, costs of suit, and attorneys fees that arise out of or result from:

1.   Respondents' performance of an inherently dangerous activity or handling of a solid waste or hazardous substance at or from the Site;

2.   Respondents' negligent, reckless, or intentional acts or omissions or such acts or omissions of any of its agents or employees; and

3.   the negligent, reckless, or intentional acts or omissions of any of Respondents' contractors or suppliers or their agents or employees.

## XXV. Liability

The State of Texas, by issuing this AO, assumes no liability for any injuries or damages to persons or property resulting from acts or omissions of Respondents, or their directors, officers, employees, agents, representatives, successors, assigns, contractors, or consultants in carrying out any of the Work. Neither TCEQ nor the State of Texas will be deemed a party to any contract entered into by any Respondent or its directors, officers, employees, agents, successors, assigns, contractors, or consultants to perform any or all of the Work or any other activity at the Site.

## XXVI. Severability

The provisions of this AO are intended to be severable and are deemed severable. Should any provision of this AO be rendered unenforceable by a court of competent jurisdiction or other appropriate authority the remaining provisions will remain valid and enforceable.

**Exhibit A**

## XXVII. TCEQ's General Reservation of Rights and Retention of Claims

Except as specified herein, nothing in this AO will constitute or be construed as a covenant not to sue by TCEQ or the State of Texas or a release from any claim, cause of action, or demand in law or equity against any person, firm, partnership, or corporation. Except as specified herein, the ED reserves and this AO is without prejudice to all rights against Respondents with respect to all matters including:

1. Claims based on Respondents' failure to fulfill the requirements of this AO;

2. Liability arising from the past, present, or future disposal, release, or threat of release of solid wastes or hazardous substances outside of or not related to the Site;

3. Liability for future disposal of solid wastes or hazardous substances at the Site, other than as provided in the RSD or in any work plan required to be developed in accordance with this AO;

4. Liability for violations of federal or state law which occur during or after implementation of the Remedial Activities;

5. Claims based on criminal liability; and

6. Claims for natural resource damages as defined by CERCLA (42 U.S.C. Sections 9601 et seq.), the Oil Pollution Act of 1990 (33 U.S.C. Sections 2701 et seq.), the Oil Spill Prevention and Response Act (Texas Natural Resources Code Chapter 40), and the Federal Water Pollution Control Act (33 U.S.C. Sections 1251 et seq.).

## XXVIII. Section Headings

Section headings are included for convenience of reference only and will be disregarded in the construction and interpretation of any of the provisions of this AO.

## XXIX. Continuing Authority

TCEQ specifically retains authority over Respondents for the duration of this AO for the purposes of issuing such further orders or directions as may be necessary or appropriate to construe, implement, modify, enforce, terminate, or reinstate the terms of this AO or for any further relief as the interest of the State of Texas may require.

## XXX. Enforcement

**Exhibit A**

1791

Except as provided in Section XXI (Stipulated Penalties) Paragraph O, nothing herein will preclude TCEQ from taking any additional enforcement actions against Respondents at any time including issuing such additional orders as TCEQ may deem necessary or from requiring Respondents to perform additional activities in the future and to completely perform all of the Work.

This AO in no way obligates the State of Texas to assist Respondents in defending contribution actions brought by other persons or entities.

XXXI. Computation of Time

A.  Deadlines falling on a weekend or a State of Texas holiday will be extended until the next business day.

B.  The terms "submit" and "provide" as used herein will refer to the date on which information, data, a document, or a record is to be received by the appropriate Party. Submittals received on the deadline date will be deemed timely.

XXXII. Opportunity to Conference

A.  The Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties may, within twenty (20) Days after the Effective Date, request a conference with the Project Manager. The request must be submitted in writing to the Project Manager. Any such conference will occur at the TCEQ's main campus in Austin.

B.  The purpose and scope of the conference will be limited to issues involving the implementation of the Remedial Activities. The conference is not an evidentiary hearing, does not constitute a proceeding to challenge this AO, and does not give Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties the right to seek review of this AO.

XXXIII. Termination of the Administrative Order

A.  The ED may terminate this AO when he determines that alternative or additional work is required at the Site because the Remediation Goals will not be attained by implementation of the Remedial Activities, unless Agreeing Respondents and the ED agree on such alternative or additional work, agree to modify the Remedial Action to include such additional or alternative work in accordance with Section V (Order) Paragraph J, and agree to modify this AO in accordance with Section V (Order) Paragraph J.

B.  Except as provided in this Section, when the ED determines that the Work has been completed in accordance with this AO, the ED will provide written notice to

Page 60 - Voda Petroleum, Inc., State Superfund Site

**Exhibit A**

1792

Agreeing Respondents that Agreeing Respondents have fully satisfied the requirements of this AO. Such notice will be issued within one hundred and eighty (180) Days after the ED determines that the Work has been completed in accordance with this AO. This notice will not, however, terminate Respondents' obligations to comply with those provisions specified herein that are intended to survive this AO, including requirements regarding record preservation and Sections XV (Records), XXI (Stipulated Penalties), XXV (Liability), XXIX (Continuing Authority), and XXX (Enforcement).

## XXXIV. Rules of Construction

The masculine, feminine, and neuter gender will each include the other and the singular and plural number will each include the other.

This AO may be executed in two or more counterparts each of which will be deemed an original but all of which together will constitute one and the same document.

## XXXV. Sovereign Immunity

The Parties hereby agree that nothing in this AO waives the State of Texas' sovereign immunity relating to suit, liability, and the payment of damages. The Parties further agree that all claims, suits, or obligations arising under or relating to this AO are subject to and limited to the availability of funds appropriated by the Texas Legislature for that respective claim, suit or obligation.

**Exhibit A**

1793

*The Chief Clerk shall send a copy of this Administrative Order to all Parties.*

Issue date: **FEB 1 2 2010**

TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY

Bryan W. Shaw, Ph.D., Chairman
For the Commission

**Exhibit A**

1794

# VODA PETROLEUM, INC.
# STATE SUPERFUND SITE
# ADMINISTRATIVE ORDER

# EXHIBIT A

# REMEDY SELECTION DOCUMENT

# REMEDY SELECTION DOCUMENT



## VODA PETROLEUM, INC.
## STATE SUPERFUND SITE
## CLARKSVILLE CITY, GREGG COUNTY, TEXAS

## SEPTEMBER 2009

*PREPARED BY: CAROL BOUCHER, P.G., PROJECT MANAGER*
*TEXAS COMMISSION ON ENVIRONMENTAL QUALITY*
*REMEDIATION DIVISION*

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................ 1

II.   PURPOSE ...................................................................................................... 1

III.  LEGAL AUTHORITY ................................................................................... 1

IV.  SITE HISTORY ............................................................................................. 2

V.   SUMMARY OF REPORTS .......................................................................... 3

VI.  ACTION LEVELS ......................................................................................... 4

VII. THE SELECTED REMEDIAL ACTION ..................................................... 5

VIII. GLOSSARY .................................................................................................... 6

## I.   INTRODUCTION

Voda Petroleum, Inc., (aka Ultra Oil) (Voda Site) occupies 6.12 acres at 211 Duncan Road, approximately 1.25 miles west of the intersection of FM 2275 (George Richey Road) and FM 3272 (North White Oak Road), 2.6 miles north-northeast of Clarksville City in Gregg County. The Voda Site was operated as a waste oil recycling facility from about 1981 until it was abandoned in November 1991.

The Texas Commission on Environmental Quality (TCEQ) is an agency in the State of Texas that implements many of the state laws relating to the conservation of natural resources and the protection of public health and safety and the environment. The TCEQ addresses certain sites that may constitute an imminent and substantial endangerment to public health and safety or the environment through the state Superfund program.

## II.   PURPOSE

This *Remedy Selection Document* (RSD) presents the *Remedial Action* (also known as "the remedy") for the Voda Site, which is designed to address the contamination and provide protection of public health and safety and the environment.

Words appearing in italics in this document are defined in Section VIII, "Glossary," of this RSD.

## III.   LEGAL AUTHORITY

The investigation of the nature and extent of contamination at the Voda Site and the selection of the *Remedial Action* is in accordance with the *Solid Waste Disposal Act*, Tex. Health & Safety Code §§ 361.001-966 (West 2008); Subchapter K: Hazardous Substance Facilities Assessment and Remediation (Subchapter K) rules found in 30 Tex. Admin. Code (TAC) §§ 335.341-351 (2009); and the *Texas Risk Reduction Program* (TRRP) rules found in 30 TAC §§ 350.1-135 (2009).

While the Subchapter K rules are specific to the Superfund process, the TRRP rules are a comprehensive program for addressing environmental contamination and apply to many different types of corrective action administered by the TCEQ. The TRRP rules establish procedures for determining the concentration of contaminants to which a person or other environmental receptor can be exposed without unacceptable risk of harm. These acceptable concentration levels are called *Protective Concentration Levels* (PCLs).

A three-tiered approach may be used under the TRRP rules to calculate the PCLs for a site. The tiers represent increasing levels of evaluation where site-specific information is factored into the process. For example, Tier 1 uses conservative, generic models that do not account for site-specific factors, Tier 2 allows for the use of site-specific information but must use PCL equations

provided by the TCEQ, and Tier 3 allows for more detailed and complex evaluations so that PCLs are appropriate for specific site conditions. The PCLs for the Voda Site were developed under Tier 1.

Critical to the analysis under all three of the tiers is the land use classification for the site. Under the TRRP rules, the land can be classified as either residential or commercial/industrial. Remediation to residential standards assumes that the site may be occupied by children and therefore is applicable not only to strictly residential land but also to playgrounds, schools, daycare centers and similar land uses. Remediation to commercial/industrial standards assumes that the site will not be regularly occupied by children and is protective of persons who may occupy the site as workers. Sites remediated to commercial/industrial standards cannot be used for residential-type activities unless further controls are implemented to make the site safe for that use. The TCEQ determined that a commercial/industrial use was appropriate for the Voda Site.

The TRRP rules allow risks posed by the presence of contamination above a PCL to be managed by any combination of the following: 1) removal or decontamination of contaminated media; 2) physical controls, such as landfills and caps, which limit exposure to the contaminated media; or *3) institutional controls*, such as deed restrictions on the future use of the property, which are also intended to limit exposure to the contaminated media. These remedies under the TRRP rules are divided into two main categories: Remedy Standard A and Remedy Standard B. To meet Remedy Standard A requirements, the contaminated media must be removed and/or decontaminated such that physical controls and, in most cases, *institutional controls* are not necessary to protect human and ecological receptors from unprotective levels of contamination based on the designated land use. To meet the requirements of Remedy Standard B, however, physical controls and *institutional controls* may be relied on to limit exposure to unprotective levels of contamination. These standards are described in detail in 30 TAC § 350.32 and § 350.33. The proposed remedy at the Voda Site meets the criteria established for Remedy Standard A.

## IV.    SITE HISTORY

The Voda Site was operated as a waste oil recycling facility from about 1981 until it was abandoned in November 1991. The Voda Site is located in a rural residential neighborhood with occupied residences directly on the east and west sides of the facility. A review of the facility waste management activity records revealed that Voda Petroleum, Inc., had received, stored and processed waste gasolines; oily wastes; used oil mixed with methyl ethyl ketone, varsol, trichloroethane, toluene, and hexane; crude oil; greases; and waxes. In 1996, the EPA conducted an emergency removal of 462 fifty-five-gallon drums of grease or oily wastes, 14 fifty-five-gallon drums of corrosive wastes, 16 above-ground tanks, and associated contaminated soil. The site was then backfilled to approximate the undisturbed topography to facilitate site drainage. The EPA response action removed the immediate threat to human health and the environment but was not intended to be and did not constitute a final remediation solution. Post removal analysis of soil and groundwater samples indicated that soil and groundwater continued to be contaminated above appropriate cleanup levels.

1799

## V.    SUMMARY OF REPORTS

### A.    HAZARD RANKING SYSTEM REPORT

The *Hazard Ranking System* (HRS) is a numerically-based screening system that uses information from initial, limited investigations to assess whether a site qualifies for the state or federal Superfund program. Sites scoring 28.5 or greater may qualify for the federal Superfund program, while sites scoring 5 or greater may qualify for the state Superfund program. The HRS scoring for the Voda Site was prepared by the TCEQ in August 1995 and is presented in the report titled "Hazard Ranking System (HRS) Documentation Record, Voda Petroleum Site, Gregg County, Texas." The Voda Site earned a score of 23.63. The TCEQ proposed to list the Voda Site on the State Registry of Superfund Sites and published notice of its intent in the *Texas Register* on November 17, 2000. 25 Tex. Reg. 11594-95 (Nov. 17, 2000).

### B.    REMEDIAL INVESTIGATION REPORT

The *Remedial Investigation* (RI) includes field work, laboratory analysis and interpretation of collected data for the purpose of determining the nature and extent of contamination associated with the Voda Site. The Phase I RI Report, dated August 2002, included a summary of the RI activities conducted at the site in May 2002. Based on the Phase I results, a second phase was conducted in April 2004, focusing on the area known as the "East Tank Farm." The Phase II RI Technical Memorandum (TM), dated July 2004, concluded that the investigation of the extent of soil contamination above cleanup standards was complete; however, additional groundwater monitor wells were needed to complete the groundwater investigation. Additional groundwater monitor wells were installed from April 2005 through May 2007. The final round of monitor well installations was found to fully define the extent of the groundwater contamination.

The following summarizes the findings of the RI:

Groundwater - The Queen City Aquifer beneath the Voda Site is impacted by various volatile organic constituents (VOCs) exceeding the PCLs applicable to a Class 1 groundwater resource.

Onsite Soil - Soil containing contaminants above cleanup standards at the Voda Site is generally limited to the East Tank Farm area, encompassing an area of approximately 60 feet by 120 feet and 12 feet deep. Contaminants exceeding cleanup standards include VOCs and Total Petroleum Hydrocarbons (TPH).

Offsite Soil/Sediment - No offsite soil or sediment contamination was detected.

Ecological Risks - The Tier 1 Exclusion Criteria Checklist determined that conditions at the Voda Site precluded the need for a formal ecological risk assessment (ERA) because

the site meets the conditions for "de minimis land area," meaning there are insignificant ecological exposure pathways at the site.

## C.    FEASIBILITY STUDY PHASE REPORT

The *Feasibility Study* (FS) for the Voda Site, dated January 2008, presented an evaluation of the potential remedial alternatives to address the chemicals of concern (COCs) in onsite soil and onsite and offsite groundwater found exceeding the applicable PCLs.

## D.    REMEDY SELECTION PHASE REPORTS AND MEETING

The Proposed Remedial Action Document (PRAD), dated June 2008, presented a brief discussion of remedial actions evaluated and the specific remedy proposed by the TCEQ to address the contaminants exceeding the PCLs at the Voda Site.

On October 23, 2008, a public meeting was held at the Broadway Elementary School Cafeteria in Gladewater, Texas, for the purpose of presenting the PRAD and soliciting public comment about the proposed remedy. Upon consideration of the comments received during the public comment period, the TCEQ selected the remedy described in this RSD.

## E.    PLUME MANAGEMENT ZONE (PMZ) DEMONSTRATION TECHNICAL MEMORANDUM (TM)

In May 2009, TCEQ technical staff reevaluated information that could be read to support the finding of two possible classifications for the groundwater at the Voda Site. As a result, pursuant to 30 TAC § 350.33(f)(4), the TCEQ conducted a PMZ demonstration in accordance with TCEQ publication RG-366/TRRP-29, Soil and Groundwater Response Objectives in July 2009. The PMZ demonstration, detailed in the PMZ Demonstration TM dated August 3, 2009, showed that the COC concentrations will exceed cleanup levels at the nearest point of exposure, an intermittent creek located on the offsite affected property. Therefore, it was confirmed that a PMZ would not meet the remedial action goals and would not be an appropriate remedy for the groundwater at the Voda Site, and the currently selected remedial action continues to best fit the statutory criteria for remedial selection.

## VI.    ACTION LEVELS

*Remedial Action* Objectives are the stated goal of the remedy that must be achieved to make the site protective of human health and the environment. Action levels are the maximum numeric concentrations of the COCs which must not exceed the Tier 1 PCLs for the appropriate land use and groundwater resource classification. For the onsite and offsite groundwater, the Tier 1 PCLs are those developed for Class 1 groundwater resources established in TRRP. For the onsite soil, the Tier 1 PCLs are those developed for Commercial/Industrial Soil with a greater than 0.5 acre source area for groundwater protection, with the exception of TPH which was developed based

on site-specific exposure criteria.  Those objectives and action levels are presented in the following table for the specific COCs found at the Voda Site:

| GROUNDWATER CONTAMINANT NAME | ACTION LEVEL (Critical PCL) | REMEDIAL ACTION OBJECTIVES |
|---|---|---|
| Benzene | 5 μg/L | Reduce COCs concentrations to levels below the action level (TRRP Tier 1 PCL for groundwater ingestion: TRRP Tier 1 $^{GW}GW_{Ing}$). |
| Dichloroethylene, 1,1- | 7 μg/L | |
| Dichloroethane, 1,2- | 5 μg/L | |
| Vinyl chloride | 2 μg/L | |

| SOIL CONTAMINANT NAME | ACTION LEVEL (Critical PCL) | REMEDIAL ACTION OBJECTIVES |
|---|---|---|
| Benzene | 0.013 mg/kg | Reduce COCs concentrations to levels below the action level (TRRP Tier 1 Commercial/Industrial Land Use PCL for surface and subsurface soil to groundwater: TRRP Tier 1 C/I $^{GW}Soil_{Ing}$). |
| Dichloroethylene, cis-1,2- | 0.12 mg/kg | |
| Ethylbenzene | 3.8 mg/kg | |
| Propylbenzene, n- | 67 mg/kg | |
| MTBE | 0.93 mg/kg | |
| Tetrachloroethylene | 0.025 mg/kg | |
| Toluene | 4.1 mg/kg | |
| Trichloroethane, 1,1,1- | 0.81 mg/kg | |
| Trichloroethylene | 0.017 mg/kg | |
| Trimethylbenzene, 1,2,4- | 72 mg/kg | |
| Trimethylbenzene, 1,3,5- | 79 mg/kg | |
| Vinyl chloride | 0.011 mg/kg | |
| Xylene, m | 53 mg/kg | |
| Xylene, o | 35 mg/kg | |
| Xylene, p | 75 mg/kg | |

## VII.   THE SELECTED REMEDIAL ACTION

In accordance with 30 TAC § 335.348(l) and the requirements of section 361.193 of the *Solid Waste Disposal Act*, the TCEQ selects the *Remedial Action* for a site by determining which remedial alternative is "the lowest cost alternative which is technologically feasible and reliable, effectively mitigates and minimizes damage to the environment, and provides adequate protection of the public health and safety and the environment." 30 TAC § 335.348(l). The TCEQ has selected excavation with offsite disposal for the onsite soil, and the installation of reactive biobarrier wells with *institutional controls* for the onsite and offsite shallow groundwater.

Also in accordance with TRRP, the *Performing Parties* (or the TCEQ if no parties agree to fund or perform the remedial action) shall record an *institutional control* in the real property records of Gregg County. The *institutional control* shall be placed on each property which overlies groundwater contaminated above the PCLs and shall describe the specific area of the groundwater plume on each affected property. The *institutional control* shall remain in place until such time as the TCEQ has determined that the *Remedial Action* Objectives have been permanently achieved. If the *Remedial Action* is implemented by the TCEQ, the TCEQ will request that the owner of each affected property voluntarily agree to record a restrictive covenant to serve as the *institutional control*. If the property owner does not agree to the restrictive covenant, the TCEQ shall record a deed notice to serve as the *institutional control*. If the *Remedial Action* is implemented by *Performing Parties*, the *Performing Parties* shall be responsible for securing the *institutional control* in the form of a restrictive covenant from the owner of the affected property. All of the elements of the *Remedial Action* described above shall be in accordance with detailed requirements established in TRRP.

Monitor wells installed at the Voda Site shall be sampled for the COCs identified in Section VI, Action Levels, and the hydraulic gradient shall be measured quarterly during the first two years and semi-annually for the following two years of the *Remedial Action*. Monitoring results shall be evaluated no less frequently than annually to verify that the plume has been reduced in both areal extent and concentration of COCs. Once the TCEQ determines that the Action Levels have been permanently achieved, the TCEQ will discontinue sampling and/or monitoring activities.

## VIII. GLOSSARY

*Feasibility Study* (FS) – A description, screening, and analysis of the potential *Remedial Action* alternatives for a site.

*Hazard Ranking System* (HRS) – The scoring system used by the TCEQ to evaluate a site for the state or federal Superfund program. The scoring system was developed by the United States Environmental Protection Agency as described in 40 Code of Federal Regulations Part 300, Appendix A.

*Institutional Control* – A legal instrument placed in the property records in the form of a deed notice, restrictive covenant, or other form established in the TRRP rules which indicates the limitations on or conditions governing the use of the property which ensures protection of human health and the environment.

*Performing Parties* – Collectively, 1) any parties who agreed to fund or conduct the remedial action by entering into an agreed order with the TCEQ and 2) parties that did not enter into an agreed order with the TCEQ but that fund or perform the selected *Remedial Action*.

*Plume Management Zone* (PMZ) – The area of the groundwater protective concentration level exceedance (PCLE) zone, plus any additional area allowed in accordance with 30 TAC § 350.33(f).

*Potentially Responsible Parties* (PRPs) – Persons or entities that the TCEQ considers potentially responsible for the contamination of the site pursuant to section 361.271 of the Texas Health and Safety Code.

*Proposed Remedial Action Document* (PRAD) – The document which describes the TCEQ's proposed *Remedial Action.*

*Protective Concentration Level* (PCL) – The concentration of a chemical of concern which can remain within the source medium and not result in levels which exceed the applicable human health risk-based exposure limit or ecological protective concentration level at the point of exposure for that exposure pathway.

*Remedial Action* – An action, including remedial design and post-closure care, consistent with a remedy taken instead of or in addition to a removal action in the event of a release or threatened release of hazardous substances into the environment to prevent or minimize the release of a hazardous substance so that the hazardous substance does not cause an imminent and substantial endangerment to present or future public health and safety or the environment.

*Remedial Investigation* (RI) – An investigative study which may include removals, and/or a *feasibility study*, in addition to the development of *protective concentration levels*, designed to adequately determine the nature and extent of release or threatened release of hazardous substances and, as appropriate, its impact on airs, soils, groundwater and surface water, both within and beyond the boundaries of the site.

*Solid Waste Disposal Act* – Ch. 361 of the Tex. Health & Safety Code. The purpose of the *Solid Waste Disposal Act* is to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste, including any hazardous waste that is generated. Subchapter F of Chapter 361 relates to the state Superfund process. The Texas Health and Safety Code is available online at: http://www.statutes.legis.state.tx.us.

*Texas Risk Reduction Program* (TRRP) – A program of the TCEQ that provides a consistent corrective action process directed toward protection of human health and the environment balanced with the economic welfare of the citizens of the state. The rules for this program are located in Chapter 350 of 30 Texas Administrative Code. The Texas Administrative Code is available online at: http://www.sos.state.tx.us/tac/.

# VODA PETROLEUM, INC.
# STATE SUPERFUND SITE
# ADMINISTRATIVE ORDER


# EXHIBIT B


# LIST OF SOLID WASTES AND HAZARDOUS SUBSTANCES AT THE SITE

Dichloroethylene, cis-1,2-
Benzene
Propylbenzene, n-
MTBE (methyl tertiary-butyl ether)
Tetrachloroethylene
Toluene
Trichloroethane, 1,1,1-
Trichloroethylene
Trimethylbenzene, 1,2,4-
Trimethylbenzene, 1,3,5-
Vinyl chloride
Xylene, m-
Xylene, o-
Xylene, p-
Dichloroethylene, 1,1-
Dichloroethane, 1,2-

# VODA PETROLEUM, INC.
# STATE SUPERFUND SITE
# ADMINISTRATIVE ORDER

## EXHIBIT C

## FIELD SAMPLING PLAN CONTENTS OUTLINE

# FIELD SAMPLING PLAN

# TABLE OF CONTENTS

Title and Approval Sheet

Distribution List

Table of Contents

1.0 Introduction

- **Investigation Phase: Purpose** - *Briefly states the specific purpose of this FSP relative to the Quality Assurance Project Plan, Work Plan and/or other documents. A schematic presentation of the project documents and the location of key planning components should be presented.*

- **RA Phase: Purpose** - *Briefly states the specific purpose of this FSP relative to the RA Contract Document, Quality Assurance Project Plan and/or other documents. A schematic presentation of the project documents and the location of key planning components should be presented.*

- **Project/Task Organization** - *Identifies the key individuals or organization participating in the project, their role(s) and responsibilities, and the organizational chart for the project. (Project specific information for QAPP Element A)[1]*

2.0 Site and Project Summary

- ***Investigation Phase: Problem Definition/Background*** - *Briefly states the site description, surrounding area, historical information, previous investigation, suspected contamination source, probable transport pathways and other site information. Most of this information is available from the Conceptual Site Model developed during the planning phase. Any specific data gaps and methods to fill the data gaps should also be discussed. States the specific problem to be solved or the decision to be made and identifies the decision maker. (Project specific information for QAPP Element A5)[1]*

- ***RA Phase: Problem Definition/Background*** - *Briefly states the site description, historical information, previous investigation, a summary of the selected remedy, a brief discussion of the remedial action activities. States the specific problem to be solved or the decision to be made and identifies the decision maker. (Project specific information for QAPP Element A5)[1]*

- ***Project/Task Description and Schedule*** - *Briefly summarizes the project and the project tasks, the turnaround time for the project, including the turnaround time requirement for laboratory analysis. (Project specific information for QAPP Element A6)[1]*

- *Describes any **special personnel and equipment** required for the specific type of work being planned or measurement being taken and any special training/certification requirements . (Project specific information for QAPP Element A8)[1]*

- **Data Acquisition Requirements (Non-direct Measurements)** - *Defines the criteria for the use of non-measurement sources, such as computer databases, programs, literature files, and historical databases. (Project specific information for QAPP Element B9)[1]*

- **Assessment Techniques** - *Defines the number, frequency, and type of quality assessment activities, the responsible staff, the procedures to be performed during the life of the project. (Project specific information for QAPP Element C1) [1]*

## 3.0 Analytical Requirements and Data Quality Objectives

- **Data Quality Objectives** - *Summarizes the project specific quality objectives and measurement performance criteria. This section should include the summary of the outcomes of the technical planning process (e.g., the 7-Step DQO process) used to develop the project objectives. The summary should also include a reference to Appendix B of the FSP, which contains a full discussion of the proposed DQOs for the project from which the summary was taken. Designates and briefly describes sampling units (e.g. AOCs, surface soil to 6 inches). States objectives by sampling unit or media. The project specific calculations or algorithms are also specified in this section. (Project specific information for QAPP Element A7) [1]*

## 4.0 Sampling Plan Design

- **Sampling Process Design** - *All the relevant components of the experimental design and the key parameters to be evaluated are included in this section. This section should include the sampling activities, the rational for the design (in terms of meeting the DQOs), the sampling design assumptions, the procedures for locating and selecting environmental samples, a classification of measurements as critical or noncritical, the type and number of samples required for the project including the required field QC samples, the sampling locations and frequency, the applicable sample matrices, and an identification of samples critical to the project. Most of this information should be available from the output from Step 7 of the DQO process. (Project specific information for QAPP Element B1)[1]*

- *Describes the sampling plan for each media, as applicable, including figures and tables.*

  *Surface Soil*
  *Subsurface Soil*
  *Groundwater*
  *Surface Water and Sediment*
  *Air*
  *Other Matrices*

- *This section should include a summary table containing a list of all chemicals of concern identified for the project with the corresponding Level of Required Performance (LORP) (e.g., action levels and preliminary remedial goals), analytical methods (including the preparation, analysis and cleanup methods), and the corresponding method quantitation limits for all analytes of concern.*

## 5.0 Sampling Methods and Sample Handling

- ***Sampling Method Requirements*** *- Identifies sampling methods and equipment and describes the procedures for sample collection, preparation, and decontamination. This section should reference the Standard Operating Procedures located in Appendix A. (Project specific information for QAPP Element B2)* [1]

- ***Sampling Handling and Custody Requirements*** *- This section should include the required sample volumes, container types, and preservation requirements for non-standard or other analytical methods proposed for project work that are not listed in Table B2-1 of the Superfund Program QAPP. This section also includes the field sample handling and custody requirements for the project. (Project specific information for QAPP Element B3)* [1]

- *This section contains the specific requirements for **field instrument/equipment testing, inspection and maintenance** for the project. Additionally, **field instrument calibration and frequency requirements** for water level, pH, temperature, conductivity, dissolved oxygen, redox potential, turbidity and other field measurements are addressed in this section as applicable to the project. This section also includes the critical field supplies, the inspection or acceptance testing requirements, and the acceptance criteria. (Project specific information for QAPP Element B6, B7, and B8)* [1]

## 6.0 Field Survey and Measurements

- *This section describes the sampling methods and criteria for **field survey and measurements**, such as land surveys, hydrogeological tests and measurements, geophysical surveys and soil gas surveys, required for the project.*

## 7.0 Additional Field Activities

- *This section contains descriptions and procedures for **other field activities**, such as presampling/mobilization activities, required notification, property access, site restoration and investigative-derived waste (IDW) handling and disposal.*

## 8.0 Exceptions, Additions and Changes to the TCEQ Superfund Program QAPP

- *List any **exceptions, additions and changes to the Superfund Program QAPP** in each of the appropriate sub-sections corresponding to the table of contents of the Program QAPP below. Site specific information (e.g., Group A and Group B elements) specified above should not be restated in this section. Please refer to the Program QAPP for details. This section should also include specifications for non-standard methods and other analytical methods not specified in the Program QAPP.*

  *GROUP A: PROJECT MANAGEMENT*
  *A.1 Title and Approval Sheet*
  *A.2 Table of Contents*
  *A.3 Distribution List*
  *A.4 Project/Task Organization*

*A.5 Problem Definition/Background*
*A.6 Project/Task Description*
*A.7 Quality Objectives and Criteria*
*A.8 Special Training/Certification*
*A.9 Documentation and Records*
    *A.9.1 Field Operation Records*
    *A.9.2 Laboratory Data Package*
    *A.9.3 Laboratory Performance Criteria Data*
    *A.9.4 Data Handling Records*
    *A.9.5 Data Reporting Package Format and Document Control*
    *A.9.6 Field Records/Data Reporting Package Archiving and Retrieval*

*GROUP B: DATA GENERATION AND ACQUISITION*
    *B.1 Sampling Process Design (Experimental Design)*
    *B.2 Sampling Methods*
        *B.2.1 Sample Containers*
        *B.2.2 Sample Volumes, Container Types, and Preservation Requirements*
    *B.3 Sample Handling and Custody*
        *B.3.1 Field Sample Handling and Custody*
        *B.3.2 Laboratory Sample Handling and Custody*
    *B.4 Analytical Methods*
        *B.4.1 Screening Methods*
        *B.4.2 Definitive Preparation Methods*
        *B.4.3 Definitive Analysis Methods*
        *B.4.4 Non-standard Method Validation*
    *B.5 Quality Control*
        *B.5.1 Definitive Analytical Methods*
        *B.5.2 Screening Methods*
        *B.5.3 Quality Control Measure Descriptions*
        *B.5.4 Elements of Quality Control*
        *B.5.5 Method Detection Limit, Method Quantitation Limit and Sample Quantitation Limit*
    *B.6 Instrument/Equipment Testing, Inspection, and Maintenance*
        *B.6.1 Maintenance Responsibilities*
        *B.6.2 Maintenance Schedules*
        *B.6.3 Spare Parts*
        *B.6.4 Maintenance Records*
    *B.7 Instrument/Equipment Calibration and Frequency*
    *B.8 Inspection/Acceptance of Supplies and Consumables*
    *B.9 Non-direct Measurements*
    *B.10 Data Management*
        *B.10.1 Logbooks and Forms*
        *B.10.2 Data Storage/Retrieval*

*GROUP C: ASSESSMENT AND OVERSIGHT*
    *C.1 Assessments and Response Actions*
    *C.2 Reports to Management*

*GROUP D: DATA VALIDATION AND USABILITY*
*D.1 Data Review, Verification and Validation*
*D.2 Verification and Validation Methods*
*D.3 Reconciliation with User Requirements*

List of Tables

List of Figures

List of Appendices

• *Appendix A - Standard Operating Procedures*

• *Appendix B - Data Quality Objectives Document*

• *Appendix C-Z - Other supporting documents as necessary.* [1]

Guidelines used in the preparation of the QAPP elements are:

• EPA Requirements for Quality Assurance Project Plans, EPA QA/R-5 (EPA/240/B-01/003), March 2001

• EPA Guidance for Quality Assurance Project Plans, EPA QA/G-5 (EPA/240/R-02/009), December 2002